POSNER, Circuit Judge.
The Affordable Care Act requires providers of health insurance (including both health insurance companies and companies that administer self-insured employer health plans on behalf of the employer— such companies are called “third party administrators”) to cover certain preventive services without cost to the insured, including, “with respect to women, such additional preventive care ... as provided for in comprehensive guidelines supported by the Health Resources and Services Administration” of the Department of Health and Human Services. 42 U.S.C. § 300gg-13(a)(4); see also 45 C.F.R. § 147.130(a)(1)(iv); 76 Fed.Reg. 46621, 46623 (Aug. 3, 2011). Guidelines specifying such care have been promulgated by the Department and include, so far as bears on this case, “all Food and Drug Administration approved contraceptive methods.” Health Resources & Services Administration, “Women’s Preventive Services Guidelines,” www.hrsa.gov/womensguidelines (visited May 14, 2015, as were the other websites cited in this opinion).
About half of all pregnancies in the United States are unintended, and 40 percent of them end in abortion and many others in premature births or other birth problems. Institute of Medicine, Clinical Preventive Services for Women: Closing the Gaps 102-03 (2011), www.nap.edu/ catalog.php?reeorcLid=13181; Lawrence B. Finer & Mia R. Zolna, “Shifts in Intended and Unintended Pregnancies in the United States, 2001-2008,” 104 Am. J. Pub. Health S43; S44 (2014). Many of the unintended pregnancies are teen pregnancies, and contraceptive use has been found to be positively correlated with decreased teen pregnancy. John S. Santelli & Andrea J. Melnikas, “Teen Fertility in Tran *608 sition: Recent and Historical Trends in the United States,” 31 Ann. Rev. Pub. Health 371, 375-76, 379 (2010). Because out-of-pocket expenditures on female contraceptives can be substantial for many women, see Su-Ying Liang et al., “Women’s Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills Between 1996 and 2006,” 83 Contraception 528, 531 (2011), the provision of such contraceptives without cost to the user can be expected to increase contraceptive use and so reduce the number both of unintended pregnancies and of abortions. See Jeffrey F. Peipert et al., “Preventing Unintended Pregnancies by Providing No-Cost Contraceptives,” 120 Obstetrics & Gynecology 1291, 1295-96 (2012). Furthermore, “women who can successfully delay a first birth and plan the subsequent timing and spacing of their children are more likely than others to enter or stay in school and to have more opportunities for employment and for full social or political participation in their community.” Susan A. Cohen, “The Broad Benefits of Investing in Sexual and Reproductive Health,” 7 Guttmacher Report on Public Policy, March 2004, pp. 5, 6; see also Martha J. Bailey et al., “The Opt-in Revolution? Contraception and the Gender Gap in Wages,” 4 American Economic Journal: Applied Economics, July 2012, pp. 251-52. For a compact and conr vincing summary of the benefits to society in general and women in particular of inexpensive access to contraception, see Priests for Life v. U.S. Dept. of Health & Human Services, 772 F.3d 229, 257-64 (D.C.Cir.2014).
The University of Notre Dame provides health benefits to both its employees and its students. It self-insures its employees’ medical expenses, but has hired Meritain Health, Inc. to administer the employee health plan without providing any insurance coverage; Meritain is therefore the third-party administrator of the university’s employee health plan. To take care of its students’ medical needs, Notre Dame has a contract with Aetna, Inc., the well-known health care and health insurance company (and Meritain’s parent); the contract gives the students the option of obtaining health insurance from Aetna at rates negotiated by Notre Dame. Meritain administers coverage for some 4600 employees of Notre Dame (out of a total of 5200) and 6400 dependents of employees. Aetna insures 2600 students and 100 dependents; Notre Dame has about 11,000 students, most of whom have coverage under either their parents’ health insurance policies or under their own policies rather than under the Aetna Notre Dame Health Plan.
Because Catholic doctrine forbids the use of contraceptives to prevent pregnancy (the “rhythm” method of avoiding pregnancy, which is permitted, is a form of abstention, not of contraception), Notre Dame has never paid for contraceptives for its employees or permitted Aetna to insure students under the Aetna Notre Dame Health Plan (or any other Aetna plan) for the expense of contraceptives. Cognizant of the religious objections of Catholic and a number of other religious institutions to contraception, and mindful of the dictate of the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb-1(a), (b), that “Government shall not substantially burden a person’s exercise of religion even if the burden results from a rule of general applicability,” unless “it demonstrates that application of the burden to the person — (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest,” some months after the enactment of the Affordable Care Act the government offered a religious exemption from the con *609 traception guidelines. See “Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services,” 76 Fed.Reg. 46621, 46626 (Aug. 3, 2011) (codified at 45 C.F.R. § 147.130(a)(1)(iv)); see also 77 Fed.Reg. 8725, 8727-29 (Feb. 15, 2012).
At first the exemption was limited to churches and so excluded religious institutions that are incorporated as nonprofit (rather than as religious) institutions, such as Notre Dame. The exclusion precipitated the filing in 2012 of a federal suit by the university against the government, claiming that the contraceptive regulations infringed rights conferred on the university by both the First Amendment and the Religious Freedom Restoration Act. That suit was dismissed on standing and ripeness grounds, the government having promised that Notre Dame wouldn’t have to comply with the regulations for one year, during which new regulations would be issued. University of Notre Dame v. Sebelius, 2012 WL 6756332, at *3-4 (N.D.Ind. Dec. 31, 2012); see “Certain Preventive Services Under the Affordable Care Act,” 77 Fed.Reg. 16501, 16502-03 (Mar. 21, 2012). The new regulations were issued as promised — and as expected they enlarged the exemption. See “Coverage of Certain Preventive Services Under the Affordable Care Act,” 78 Fed.Reg. 39870, 39875-90 (July 2, 2013); 29 C.F.R. § 2590.715-2713A(a); 45 C.F.R. § 147.131(b). As a result, Notre Dame now came within its scope.
But to exercise its right conferred by the new regulations to opt out of having to pay for contraceptive coverage either directly (with or without the administrative assistance of a third-party administrator, such as Meritain) or through a health insurer, such as Aetna, the university had to fill out “EBSA Form 700 — Certification.” See 45 C.F.R. § 147.131(b)(4). The form (www.dol.gov/ebsa/pdf/preventiveser viceseligibleorganizationcertificationfprm. pdf) is short, its meat the following sentence: “I certify that, on account of religious objections, the organization opposes providing coverage for some or all of any contraceptive services that would otherwise be required to be covered; the organization is organized and operates as a nonprofit entity; and the organization holds itself out as a religious organization.” The form states that “the organization or its plan must provide a copy of this certification to the plan’s health insurance issuer (for insured health plans) or a third party administrator (for self-insured health plans) in order for the plan to be accommodated with respect to the contraceptive coverage requirement.” So Notre Dame, if it decided to sign the exemption form, would have to give copies to both Aetna and Meritain.
As noted at the outset of this opinion, the Affordable Care Act requires providers of health insurance (including third-party administrators of self-insured health plans, even though they are conduits rather than ultimate payors of plan benefits) to provide contraceptive coverage for women. See also 45 C.F.R. §§ 147.131(c)(2)(i)(B), (ii); 29 C.F.R. § 2590.715-2713A(b)(3). The exemption form if signed by Notre Dame and sent to Aetna and Meritain would therefore inform them that since Notre Dame was not going to pay for contraceptive coverage of its students and staff, Aetna and Meritain would have to pay. Aetna (including its Meritain subsidiary) has neither religious nor financial objections to paying for contraception. Regarding the cost to these companies, the government will reimburse at least 110 percent of the third-party administrator’s (Meritain’s) costs, 45 C.F.R. § 156.50(d)(3), while Aetna can expect to recoup its costs of contraceptive coverage from savings on pregnancy medical care (since there will be *610 fewer pregnancies if contraception is more broadly available, at no cost, to Notre Dame’s female employees and students) as well as from other regulatory offsets. See “Coverage of Certain Preventive Services Under the Affordable Care Act,” supra, 78 Fed.Reg. at 39877-78.
The regulations required Aetna and Meritain, if Notre Dame signed and sent the exemption form — but not Notre Dame — to inform the university’s female employees and students that those companies would be covering their contraceptive costs. See 26 C.F.R. § 54.9815-2713A(d); 29 C.F.R. § 2590.715-2713A(d). The companies could either “provide payments for contraceptive services” themselves or, alternatively, “arrange for an insurer or other entity to provide’ payments for” those services, but they could not “impos[e] any cost-sharing requirements (such as a co-payment, coinsurance, or a deductible), or impos[e] a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries.” 29 C.F.R. §§ 2590.715-2713A(b)(2), (c)(2).
The regulations thus sought an accommodation between the secular interests that had motivated the requirement to provide contraceptive services to women free of charge and the interests of religious objectors. Accommodation is consistent with the balancing act required by the Religious Freedom Restoration Act, which as we noted requires consideration of “substantial burden” (on the institution unwilling to provide contraceptive services), a “compelling governmental interest” in that provision, and the “least restrictive means” that is feasible for realizing the government’s interest.
When the accommodation was promulgated in July of 2013, Notre Dame did not at first bring a new suit (remember that its previous suit, brought when the university was excluded from opting out of contraceptive coverage, had been dismissed on jurisdictional grounds, and those grounds were irrelevant to a suit challenging the new regulations). Not until December 2013 did the university file the present suit, challenging the accommodation. The deiay in suing was awkward, since the regulations were to take effect with respect to the employee health plan — and did take effect — on January 1, 2014. “Coverage of Certain Preventive Services Under the Affordable Care Act,” supra, 78 Fed.Reg. at 39889. (The student health plan, provided by Aetna, had until August 2014 to comply. See id.; University of Notre Dame, 2013-2011. Student Injury and Sickness Insurance Plan 3, 5, http://uhs.nd.edu/assets/ 108455/nd_brochure_1314.pdf.)
With the January deadline for compliance looming, the university, less than a week after filing its second suit on December 3, 2014, asked the district court to issue a preliminary injunction that would prevent the government from enforcing the regulation against it pending a trial. The district judge denied the motion on December 20, and Notre Dame filed its appeal from that denial the same day. On December 30 we denied the university’s emergency motion for an injunction pending appeal. The next day — the last day before it would be penalized for violating the regulations — the university signed EBSA Form 700 and thereby opted out of providing contraceptive coverage for its employees. On January 28 it filed with us a second appeal from the denial of the preliminary injunction that it had sought. Later it signed the same form regarding Aetna.
The lawsuit had been only a few weeks old when Notre Dame appealed, and so the district judge suspended all proceedings in his court pending our resolution of the *611 appeal (which as just noted had become two appeals). The parties had thus had only a slender window in which to present evidence, and very little had been presented. Because of Notre Dame’s focus on obtaining relief at the appellate level, there has been no resumption of proceedings in the district court, and as a result there is very little evidence in the record before us. That is one reason why, in a decision issued on February 21, 2014, we declined (with one member of the panel dissenting) to reverse the district judge’s denial of the preliminary injunction sought by Notre Dame. University of Notre Dame v. Sebelius, 743 F.3d 547 (7th Cir.2014). A few months later, in an almost identical case, the Sixth Circuit also ruled in favor of the government, Michigan Catholic Conference & Catholic Family Services v. Burwell, 755 F.3d 372 (6th Cir.2014), vacated and remanded, — U.S. -, 135 S.Ct. 1914, 191 L.Edüd 760 (2015), and afterward was joined by the D.C. Circuit in Priests for Life v. U.S. Dept. of Health & Human Services, supra.
Notre Dame continued filing appellate petitions, the most notable being a petition for certiorari, granted by the Supreme Court on March 9 of this year in an order (University of Notre Dame v. Burwell, — U.S.-, 135 S.Ct. 1528, 191 L.Ed.2d 557) that states in its entirety: “On petition for writ of certiorari to the United States Court of Appeals for the Seventh Circuit. Petition for writ of certiorari granted. Judgment vacated, and case remanded to the United States Court of Appeals for the Seventh Circuit for further consideration in light of Burwell v. Hobby Lobby Stores, Inc., 573 U.S. -, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014).” With the case now back in this court, the parties filed position statements, after which we heard oral argument for an hour and fifty minutes. The discussion of issues that follows in this opinion is based on the position statements and oral argument, on portions of our original opinion, and on the Hobby Lobby decision.
Our previous opinion had expressed puzzlement about what exactly the university wanted us to enjoin. It had by that time signed EBSA Form 700 and sent copies to Aetna and Meritain, thus obtaining the statutory accommodation, and the companies had notified Notre Dame’s employees and students that they (the companies, not the university) would be providing contraceptive coverage. We now have (we think) a clearer idea of what the university wants. It wants us to enjoin the government from forbidding Notre Dame to bar Aetna and Meritain from providing contraceptive coverage to any of the university’s students or employees. Because of its contractual relations with the two companies, which continue to provide health insurance coverage and administration for medical services apart from contraception as a method of preventing pregnancy, Notre Dame claims to be complicit in the sin of contraception. It wants to dissolve that complicity by forbidding Aetna and Meritain — with both of which, to repeat, it continues to have contractual relations — to provide any contraceptive coverage to Notre Dame students or staff. The result would be that the students and staff currently lacking coverage other than from Aetna or Meri-tain would have to fend for themselves, seeking contraceptive coverage elsewhere in the health insurance market.
Notre Dame does not forbid its students or staff to use contraception or to obtain reimbursement from health insurance companies for their purchase of contraceptives. Its objection that it asks us to ratify by issuing a preliminary injunction is to Aetna’s and Meritain’s being legally obligated to make contraceptive coverage available to Notre Dame students and staff. It regards its contractual relation *612 ship with those companies as making the university a conduit between the suppliers of the coverage and the university’s students and employees. In the university’s words, the contraception regulation imposes a substantial burden on it by forcing the university to “identify[] and contraet[] with a third party willing to provide the very services Notre Dame deems objectionable.”
But the scanty record contains no evidence to support the conduit theory. Although Notre Dame is the final arbiter of its religious beliefs, it is for the courts to determine whether the law actually forces Notre Dame to act in a way that would violate those beliefs. As far as we can determine from the very limited record, the only “conduit” is between the companies and Notre Dame students and staff; the university has stepped aside. Thus it tells its students (and we assume its staff as well) that “the University of Notre Dame honors the moral teachings of the Catholic Church. Therefore, for example, University Health Services may prescribe contraceptive medications to treat approved medical conditions, but not to prevent pregnancy. To comply with federal law, Aetna Student Health provides coverage for additional women’s health products or procedures that the University objects to based on its religious beliefs. This coverage is separate from, Notre Dame. Students enrolled in Aetna Student Health may call Aetna customer service at 877-378-9492 for more information. Students not covered by Aetna Student Health should check with their own insurance plans regarding federally-mandated women’s health coverage.” University of No-tre Dame Health Services, “FAQ-Aetna Student Health,” http://uhs.nd.edu/ insurance-billing/faq-aetna-student-health-ans/ (emphasis added). There thus is no suggestion that Notre Dame is involved at all in Aetna’s and Meritain’s contraception coverage.
When the case was last before us, in 2014, the university’s lawyer had similarly argued that Notre Dame’s health plans were the “conduit” through which the employees and students obtained contraceptive coverage, making Notre Dame complicit in sin. But the lawyer also had said that his client would have no problem if each of its female employees signed and mailed to Meritain (and its students mailed to Aetna) a form saying “I have insurance through Notre Dame, but the university won’t cover contraceptive services, so now you must cover them.” It’s difficult to see how that would make the health plan any less of a “conduit” between Notre Dame and Aetna/Meritain.
It’s not even clear that by forcing Aet-na/Meritain to provide Notre Dame’s students and staff with contraception coverage the government is forcing Notre Dame to do business with an entity that is providing an objectionable service to the Notre Dame community. For the government authorizes a third-party administrator to “arrange for an issuer or other entity” to pay for contraception coverage and bill the expense to the government. 29 C.F.R. § 2590.715-2713A(b)(2)(ii). No-tre Dame thus could ask Meritain to outsource contraception coverage for both students and staff to an entity that does no business with Notre Dame. The university would have no contractual relationship with that entity and so would not be involved even indirectly in the provision of contraceptive coverage to its students and employees.
A further problem with Notre Dame’s quest for a preliminary injunction is the absence from the record of its contracts with Aetna and Meritain. We are not told what the duration of the contracts is, whether or in what circumstances they are *613 terminable by Notre Dame before their expiration date, or what the financial consequences to the companies might be given that the federal government reimburses health insurers’ contraception payouts generously. So far as contraception is concerned, health insurers are merely intermediaries between the federal government and the consumers. We are led in turn to wonder whether the government — which rarely provides health services directly to patients but rather uses health care companies to provide those services as the government’s agents — might without offending Notre Dame’s religious scruples hire Aetna and Meritain to provide that coverage. That would be simpler and more direct than the government’s shopping for other health insurance companies to be its agents in dealing with Notre Dame’s students and staff.
It is irregular, moreover, for a court to be asked to enjoin nonparties. For all we know, Aetna and its subsidiary value the opportunity to provide contraception coverage with generous reimbursement by the federal government. (The record, consistent with its sparseness, contains almost nothing about Aetna or Meritain.) Their business is providing health care, health care administration, and health insurance, and Notre Dame wants unilaterally to exclude them from a possibly lucrative chunk of that business. When the university, albeit under protest, signed and mailed the exemption form, Aetna and Meritain reasonably believed that they had an economic opportunity — that for the first time they would be providing contraceptive coverage to the Notre Dame community. (Remember that before the Affordable Care Act was passed they provided no such coverage to the community.) They have had no opportunity to intervene in the district court, where proceedings have been suspended pending Notre Dame’s appellate submissions culminating in this case.
Notre Dame takes particular umbrage at the regulation under the Affordable Care Act which states that “if the eligible organization provides a copy of the self-certification [EBSA Form 700] of its objection to administering or funding any contraceptive benefits ... to a third party administrator [Meritain], the self-certification shall be an instrument under which the plan is operated, [and] shall be treated as a designation of the third party administrator as the plan administrator under section 3(16) of ERISA for any contraceptive services required to be covered under § 2590.715-2713(a)(l)(iv) of this chapter to which the eligible organization objects on religious grounds.” 29 C.F.R. § 2510.3-16(b). (What a mouthful!) Notre Dame treats this regulation as having made its mailing of the certification form to its third-party administrator (Meritain) the cause of the provision of contraceptive services to its employees in violation of its religious beliefs. That’s not correct. Since there is now a federal right, unquestioned by Notre Dame, to contraceptive services, the effect of the university’s exercise of its religious exemption is to throw the entire burden of administration on the entities (Aetna and Meritain) that now provide contraceptive coverage to Notre Dame’s students and staff. The university is permitted to opt out of providing federally mandated contraceptive services, and the federal government determines (enlists, drafts, conscripts) substitute providers, and it is not surprising that'they are' the providers who already are providing health services to university students and staff.
The university argues that by conditioning its right not to provide contraceptive coverage for its students and staff on its signing EBSA Form 700 and giving copies to Aetna and Meritain, the government has, in violation of RFRA, “substantially *614 burden[ed] a person’s exercise of religion” (the university is a nonprofit corporate “person”; cf. 1 U.S.C. § 1; Korte v. Sebelius, 735 F.3d 654, 674 (7th Cir.2013)), and that no “compelling governmental interest” justifies that burdening. It notes that the Catholic concept of “scandal” forbids the encouragement (equivalent to aiding and abetting) of sinful acts; a 2013 affidavit by Notre Dame’s executive vice-president defines “ ‘scandal’ ... in the theological context ... as encouraging by words or example other persons to engage in wrongdoing.” Of course in invoking the exemption the university also throws the entire administrative and financial burden of providing contraception on the health insurer and third-party administrator, which are secular organizations that unlike the university have no aversion to providing contraceptive coverage. The result is to lift a burden from the university’s shoulders.
Alternatively Notre Dame charges that the government has “eoeree[d] [it] into serving as the crucial link between contraceptive providers and recipients.” That’s a recursion to the “conduit” theory, and ignores that as a result of the university’s signing the exemption form, students and staff now deal directly with Aetna and Meritain, bypassing Notre Dame. It is federal law, rather than the religious organization’s signing and mailing the form, that requires health-care insurers, along with third-party administrators of self-insured health plans, to cover contraceptive services. By refusing to fill out the form Notre Dame would subject itself to penalties, but Aetna and Meritain would still be required to provide the services to the university’s students and employees.
Notre Dame says no — that had it not filled out the form, Meritain wouldn’t have been authorized to provide contraceptive services because it would have been a “plan administrator” under section 3(16) of ERISA, 29 U.S.C. § 1002(16), and thus not a plan fiduciary entitled to make expenditures (as for contraception coverage) on behalf of the plan. The university argues that it alone is authorized to designate a plan fiduciary, 29 U.S.C. § 1102(a)(2), and that it made that designation in the form that it mailed to the company and thus is complicit in the provision of contraceptives to the university’s staff. This version of Notre Dame’s “triggering” argument does not apply to Aetna, which is the students’ health insurer and so already a plan fiduciary, 29 U.S.C. § 1002(21)(A), required therefore by the Affordable Care Act to provide contraceptive coverage to plan members whether or not Notre Dame signs the form. 45 C.F.R. §§ 147.130(a)(l)(iv), 147.131(f). Even as to Meritain, although “many agreements between third party administrators and plan sponsors prohibit third party administrators from serving as fiduciaries,” “Coverage of Certain Preventive Services Under the Affordable Care Act,” swpra, 78 Fed. Reg. at 39879, “many” is not “all” or even “most.” Notre Dame has presented no evidence that its contract with Meritain forbids the latter to be a plan fiduciary (remember that the contract is not in the record).
Nor has the university been ordered to name Meritain as a plan fiduciary. Rather, the signed form “shall be treated as a designation of the third party administrator as the plan administrator under section 3(16) of ERISA for any contraceptive services required to be covered.” 29 C.F.R. § 2510.3-16(b) (emphasis added). Treated and designated by whom? By the government. The delivery of a copy of the form to Meritain reminds it of an obligation that the law, not the university, imposes on it— the obligation to pick up the ball if Notre Dame decides, as is its right, to drop it. Notre Dame’s signing the form no more *615 “triggers” Meritain’s obligation to provide contraceptive services than a tortfeasor’s declaring bankruptcy “triggers” his co-tortfeasors’ joint and several liability for damages. Meritain must provide the services no matter what; signing the form simply shifts the financial burden from the university to the government, as desired by the university.
Suppose the United States, like the United Kingdom, Canada, and many other foreign nations, had a “single payer” health care system. In such a system, the government pays the cost of specified medical services (if the United States had such a system, it would be the equivalent of Medicare for everyone), rather than employers, health insurers, and patients, though patients may be charged directly for some of the expense of the medical care provided by the system, as distinct from indirectly through taxes. If our hypothetical single-payer system paid the full expense of female contraceptives, No-tre Dame couldn’t argue that the system placed a “substantial burden” on the university’s compliance with Catholic doctrine, for Notre Dame does not deny the existence of the legitimate secular interests noted at the outset of this opinion that justify a federal program of paying for contraceptive expenses. (For a summary of those interests, see “Coverage of Certain Preventive Services Under the Affordable Care Act,” supra, 78 Fed.Reg. at 39872-73.) It even advised the district court that to “achieve its asserted interests without forcing Notre Dame to violate its religious beliefs” the government could “directly provide contraceptive[s]” to the university’s staff and students or, alternatively, “directly offer insurance coverage for contraceptive services.” The consequence in either case would be a single-payer system for contraceptives. The main difference between such a system and the Affordable Care Act is that under the Act the government, instead of providing medical services directly, uses private insurance providers and health plan administrators as its agents to provide medical services subsidized by the government.
If the government is entitled to require that female contraceptives be provided to women free of charge, it is unclear how signing the form that declares Notre Dame’s authorized refusal to pay for contraceptives for its students or staff, and its mailing the authorization document to those companies, which under federal law are obligated to pick up the tab, could be thought to “trigger” the provision of contraceptive coverage.
But we must — we have been ordered by the Supreme Court to — consider the bearing on our analysis of Burwell v. Hobby Lobby Stores, Inc., —- U.S. -, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014). The case (anticipated by our decision in Korte v. Sebelius, supra) involved three closely held for-profit corporations whose owners objected on religious grounds to having (by virtue of the contraception provisions of the Affordable Care Act and the regulations issued under it) to provide insuran.ee coverage for their employees’ purchase of contraceptives that can destroy a fertilized ovum, such as “morning after” pills and intrauterine contraceptive devices (IUDs); the owners’ objections were thus objections not to contraceptives as such but to what they considered to be abortifacients. The question was whether RFRA should be interpreted to apply to nonreligious institutions owned by persons having sincere religious objections to their institutions’ having to comply with the ACA’s contraceptive regulations. The Court held that it should be so interpreted, and therefore the institutions would be entitled to the “accommodation,” that is, to fill out form ESBA 700 and mail it to their health insurers: “HHS has already established an *616 accommodation for nonprofit organizations ■with religious objections. Under that accommodation, the organization can self-eertify that it opposes providing coverage for particular contraceptive services. If the organization makes such a certification, the organization’s insurance issuer or third-party administrator must ‘[ejxpressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan’ and ‘[pjrovide separate payments for any contraceptive services required to be covered’ without imposing ‘any cost-sharing requirements ... on the eligible organization, the group health plan, or plan participants or beneficiaries.’ ” 134 S.Ct. at 2782 (citations and cross-reference omitted). This of course is what Notre Dame did in our case; the companies in the Hobby Lobby case did it without protesting— which shows how different the two cases are. The companies in Hobby Lobby requested the accommodation; Justice Kennedy, concurring in Hobby Lobby, described the accommodation as an “existing, recognized, workable, and already implemented framework to provide coverage” for employees of “ah objecting employer.” 134 S.Ct. at 2786. Notre Dame, in contrast, deems the accommodation a violation of its religious rights.
The Supreme Court did leave open in Hobby Lobby the possibility that the accommodation sought and obtained there would not prevent religious beliefs or practices from being substantially burdened in some cases. But it gave no examples; perhaps it remanded our case for further consideration of that possibility. We’ve suggested in this opinion that Notre Dame could as an alternative to the official accommodation direct Meritain to delegate to companies that have no contractual relationship with Notre Dame (as Aetna and Meritain do) the provision of contraception coverage to the university’s students and staff. Then Notre Dame would be outside the loop.
Notre Dame does note possible alternatives, such as a single-payer system in which Notre Dame women would apply directly to the government for reimbursement of their costs of buying contraceptives. But at this stage in the litigation, with no trial having been conducted, we have no basis for concluding that any of the university’s proposed alternatives would avoid imposing an unreasonable cost either on the government or on Notre Dame’s students and employees. The government, as we said, typically provides medical services, including reimbursement of costs incurred by medical providers, indirectly, through health insurance companies such as Aetna. Does Notre Dame expect the government to establish a federal contraception agency to which Notre Dame women should send the bills for the contraceptives they buy? Alternatively, must every woman who wants reimbursement of contraceptive costs pick a health insurance company, maybe on the basis of a Google search, to contract with? This seem to be what the university has in mind when it says in its position statement that it has no “objection to a system in which its employees or students coordinated with an independent insurer to provide coverage that ‘would not involve Notre Dame’ ” (emphasis in original). But because it’s a bother for a person to shop for the “best” contraceptive coverage, the proposed solution would reduce the number of women with such coverage, compared to their being entitled to such coverage automatically by virtue of being Notre Dame students or employees. See Brigitte C. Madrian & Dennis F. Shea, “The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior,” 116 Quarterly Journal of Economics 1149 (2001), comparing employee participation in employer-sponsored *617 savings plans under “opt-in” and “opt-out” enrollment and finding that there is much greater participation when one has to opt out in order to forgo it.
The Supreme Court pertinently observed in its Hobby Lobby opinion that the official accommodation (the accommodation that Notre Dame wants to escape from) would not impede “women’s receipt of benefits by requiring them to take steps to learn about, and to sign up for, a new government funded and administered health benefit.” 134 S.Ct. at 2783. So far as we can tell from an undeveloped record, the alternatives suggested by Notre Dame would impede the receipt of such benefits.
Notre Dame says in its position statement that the government has “many alternative ways of providing free contraceptive coverage without using the health plans of objecting religious non-profits as the conduit” (emphasis added). Put to one side the question in what sense students and staff dealing directly as they now do with Aetna and Meritain are “using” Notre Dame’s health plans — plans that exclude, contraception coverage. Our present concern is that Notre Dame has thus far failed to explain the “many alternative ways” (elsewhere it refers to “the myriad ways” or “any number of ways” in which the government can provide free contraceptive coverage to Notre Dame’s students and staff) — and it admits that it (that is, Notre Dame) “opposes many of these alternatives on policy grounds.”
It lists the following “myriad ways”: The government could
(i) directly provide contraceptive services to the few individuals who do not receive it under their health plans;
(ii) offer grants to entities that already provide contraceptive services at. free or subsidized rates and/or work with these entities to expand delivery of the services;
(iii) directly offer insurance coverage for contraceptive services;
(iv) grant tax credits or deductions to women who purchase contraceptive services; or
(v) allow Notre Dame and other Catholic non-profit organizations to comply with the Mandate [what we are calling the accommodation or official accommodation] by providing coverage for methods of family planning consistent with Catholic beliefs (i.e., Natural Family Planning training and materials).
Number v is not contraception at all; iv elides all consideration of the costs and complications of the administrative machinery for providing tax incentives to consumers; options i through iii similarly would involve cumbersome administrative machinery and at the same time impose a burden on Notre Dame’s female students and employees who want to obtain contraceptives.
Nor does Notre Dame explain how a government program that directly or indirectly provided contraception coverage to Notre Dame employees — as Notre Dame suggests — would avoid complicity in sin. Were Notre Dame to hire an unemployed person who, by virtue of becoming employed by Notre Dame, obtained contraception coverage for the first time, would not the university be “triggering” the new employee’s access to contraception?
We point out, finally, that a religious institution does not have to sign ESBA 700 •in order to exempt itself from the requirement of providing contraceptive coverage to employees and (if the institution is a college or university) students. It can in the alternative notify the Department of Health and Human Services. That was the alternative chosen by another institu *618 tion of higher learning that was unwilling to provide contraceptive coverage or even sign the ESBA 700. In Wheaton College v. Burwell, — U.S.-, 134 S.Ct. 2806, 189 L.Ed.2d 856 (2014) (per curiam), the Supreme Court said that “if the applicant informs the Secretary of Health and Human Services in writing that it is a nonprofit organization that holds itself out as religious and has religious objections to providing coverage for contraceptive services, the respondents are enjoined from enforcing against the applicant the challenged provisions of the Patient Protection and Affordable Care Act and related regulations pending final disposition of appellate review. To meet the condition for injunction pending appeal, the applicant need not use the form prescribed by the Government, EBSA Form 700, and need not send copies to health insurance issuers or third-party administrators.” We assume that Notre Dame could ask Aetna and Meritain to ignore its submission to them of the signed ESBA 700, and instead could itself inform the Secretary of Health and Human Services of its desire to be exempt on religious grounds from providing contraceptive coverage; undoubtedly the Secretary would agree.
Notre Dame tells us that it likewise objects to that alternative. But based on the sparse record before us, there is a strong argument that given the government’s legitimate interest in the provision of contraceptive coverage to women without cost to them, notice to the government would strike the proper balance between legitimate governmental and sincere religious interests. That was the accommodation sought and received by Wheaton College.
We are put in mind of Bowen v. Roy, 476 U.S. 693, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986). Roy objected that any use of. his daughter’s Social Security number would substantially burden his religious beliefs because he believed that use of that unique identifier would harm her spirit. He wanted an accommodation that would relieve him of the burden of providing the number in his applications for welfare and food stamps and prevent the government from using the number in its internal administration. The Supreme Court refused. It said that “Roy may no more prevail on his religious objection to the Government’s use of a Social Security number for his daughter than he could on a sincere religious objection to the size or color of the Government’s filing cabinets.” Id. at 700, 106 S.Ct. 2147. The very word “accommodation” implies a balance of competing interests; and when we compare the burden on the government or third parties of having to establish some entirely new method of providing contraceptive coverage with the burden on Notre Dame of simply notifying the government that the ball is now in the government’s court, we cannot conclude that'Notre Dame has yet established its right to the injunctive relief that it is seeking before trial. The mandate to cover contraceptive care as part of any broad health insurance package provided by employers (or in the case of educational institutions, students as well) was intended to minimize financial, administrative, and logistical obstacles to such coverage. See 78 Fed.Reg. 39888 (July 2, 2013), rejecting alternative proposals and explaining the importance of minimizing costs and logistical and administrative obstacles to contraceptive coverage; see also Priests for Life v. U.S. Dept. of Health & Human Services, supra, 772 F.3d at 265. All of Notre Dame’s suggested alternatives would impose significant financial, administrative, and logistical obstacles by requiring women to sign up for separate coverage either with a government agency or with another private insurer. Such obstacles were considered by the- Supreme *619 Court in Hobby Lobby in support of the same accommodation that Notre Dame refuses to accept.
We emphasize in closing the tentative character of the analysis in this opinion. The record is insufficiently developed to enable us to rule definitively on Notre Dame’s claims. The burden of establishing an entitlement to a preliminary injunction was of course on the university, not on the government. The burden has not been carried. Chief Judge Simon’s denial of preliminary relief is therefore once again
Affirmed.