# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

June 22, 2015

No. 14-20112

Lyle W. Cayce
Clerk

EAST TEXAS BAPTIST UNIVERSITY; HOUSTON BAPTIST UNIVERSITY,

Plaintiffs–Appellees,

WESTMINSTER THEOLOGICAL SEMINARY,

Intervenor Plaintiff–Appellee,

versus

SYLVIA MATHEWS BURWELL, in her official capacity as
　Secretary of the United States Department of Health and Human Services;

THOMAS PEREZ, in his official capacity as
　Secretary of the United States Department of Labor;

JACOB J. LEW, in his official capacity as
　Secretary of the United States Department of Treasury;

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;

UNITED STATES DEPARTMENT OF LABOR;

UNITED STATES DEPARTMENT OF TREASURY,

Defendants–Appellants.

Appeal from the United States District Court
for the Southern District of Texas

* * * * * * * * * * * * * *

Nos. 14-20112, 14-10241, 14-40212, 14-10661

————

No. 14-10241

————

UNIVERSITY OF DALLAS,

Plaintiff–Appellee,

versus

SYLVIA MATHEWS BURWELL, in her official capacity as
  Secretary of the United States Department of Health and Human Services;

THOMAS PEREZ, in his official capacity as
  Secretary of the United States Department of Labor;

JACOB J. LEW, in his official capacity as
  Secretary of the United States Department of Treasury;

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;

UNITED STATES DEPARTMENT OF LABOR;

UNITED STATES DEPARTMENT OF TREASURY,

Defendants–Appellants.

————

Appeal from the United States District Court
for the Northern District of Texas

————

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

Nos. 14-20112, 14-10241, 14-40212, 14-10661

———————

No. 14-40212

———————

CATHOLIC DIOCESE OF BEAUMONT;

CATHOLIC CHARITIES OF SOUTHEAST TEXAS, INCORPORATED,

Plaintiffs–Appellees,

versus

SYLVIA MATHEWS BURWELL, in her official capacity as
Secretary of the United States Department of Health and Human Services;

THOMAS PEREZ, in his official capacity as
Secretary of the United States Department of Labor;

JACOB J. LEW, in his official capacity as
Secretary of the United States Department of Treasury;

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;

UNITED STATES DEPARTMENT OF LABOR;

UNITED STATES DEPARTMENT OF TREASURY,

Defendants–Appellants.

———————————

Appeal from the United States District Court
for the Eastern District of Texas

———————————

* * * * * * * * * * * * * * *

———————

No. 14-10661

———————

Nos. 14-20112, 14-10241, 14-40212, 14-10661

CATHOLIC CHARITIES, DIOCESE OF FORT WORTH, INCORPORATED,

Plaintiff–Appellee,

versus

SYLVIA MATHEWS BURWELL, in her official capacity as
  Secretary of the U.S. Department of Health and Human Services;

THOMAS PEREZ, in his official capacity as
  Secretary of the U.S. Department of Labor;

JACOB J. LEW, in his official capacity as
  Secretary, U.S. Department of Treasury;

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;

UNITED STATES DEPARTMENT OF LABOR;

UNITED STATES DEPARTMENT OF TREASURY,

Defendants–Appellants.

---

Appeal from the United States District Court
for the Northern District of Texas

---

Before REAVLEY, SMITH, and GRAVES, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

In these consolidated appeals, religious organizations challenge, under the Religious Freedom Restoration Act ("RFRA"),[1] a requirement that they either offer their employees health insurance that covers certain contraceptive services or submit a form or notification declaring their religious opposition to that coverage. The district courts held that the requirement violates RFRA or,

---

[1] 42 U.S.C. §§ 2000bb to 2000bb-4, *invalidated in part by City of Boerne v. Flores*, 521 U.S. 507 (1997).

in one case, that the plaintiffs had demonstrated a substantial likelihood of establishing that it does, so they enjoined the government from enforcing it. Because the plaintiffs have not shown and are not likely to show that the requirement substantially burdens their religious exercise under established law, we reverse.

## I.

## A.

Under the Affordable Care Act ("ACA"),[2] employers with fifty or more full-time employees generally must offer their employees a group health plan[3] that provides "minimum essential coverage." *See* 26 U.S.C. §§ 4980H(a), (c)(2), 5000A(f)(2). Plans typically must cover all FDA-approved contraceptive methods and sterilization procedures for women[4] without copayments or deductibles.[5] Two types of plans are automatically exempt from the so-called contraceptive mandate: grandfathered plans, meaning those that have not made certain specified changes since March 2010, *see* 42 U.S.C. § 18011(a), and plans offered by religious employers, defined by reference to the Tax Code to include mostly churches themselves, as distinguished from associated educational or

---

[2] Pub. L. No. 111-148, 124 Stat. 119 (2010) (codified as amended in scattered sections of the U.S. Code).

[3] The term "group health plan" includes both insured plans, in which an insurer writes a policy and bears the risk of claims, and self-insured plans, in which the employer bears the risk but may contract with a third-party administrator to perform administrative tasks such as processing claims.

[4] We refer to the contraceptive methods and sterilization procedures collectively as "contraceptives" unless otherwise indicated.

[5] *See* 42 U.S.C. § 300gg-13(a)(4); Group Health Plans and Health Insurance Insurers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8725–26 (Feb. 15, 2012).

Nos. 14-20112, 14-10241, 14-40212, 14-10661

charitable institutions.[6] An employer that does not comply with these require-ments faces draconian penalties: $2,000 per full-time employee per year for not offering a plan at all[7] and $100 per affected individual per day for offering a plan that provides insufficient coverage, 26 U.S.C. § 4980D(a), (b)(1).

An "accommodation" is available to religious entities that do not qualify as religious employers but seek exemption from the mandate. To avail itself of that option, (1) an organization must oppose, on religious grounds, providing coverage for some or all contraceptives; (2) it must be organized as a nonprofit; (3) it must hold itself out as religious; and (4) it must certify that it satisfies the foregoing criteria.[8] It can certify in two ways.

The first way is to complete EBSA[9] Form 700 and send it to its insurer or third-party administrator.[10] The person signing the form must certify that the organization meets the requirements and that the form is believed to be correct.[11] The form requires the name of the organization, the name and title of the person signing it, and contact information. DEP'T OF LABOR, *supra* note 11, at 1. The second way in which an organization can certify is to submit a notice to the Department of Health and Human Services ("HHS").[12] The

---

[6] *See* 45 C.F.R. § 147.131(a) (citing 26 U.S.C. § 6033(a)(3)(A)(i), (iii)).

[7] 26 U.S.C. § 4980H(a), (c)(1). The penalty applies if at least one employee enrolls in a subsidized plan through an exchange. *See id.* § 4980H(a)(2).

[8] 26 C.F.R. § 54.9815-2713A(a); 29 C.F.R. § 2590.715-2713A(a); 45 C.F.R. § 147.131(b).

[9] "EBSA" stands for "Employee Benefits Security Administration," which is part of the Department of Labor.

[10] 29 C.F.R. § 2590.715-2713A(b)(1)(ii), (c)(1); 45 C.F.R. § 147.131(c)(1).

[11] DEP'T OF LABOR, EBSA FORM 700 1 (2014), http://www.dol.gov/ebsa/-preventiveserviceseligibleorganizationcertificationform.doc.

[12] 29 C.F.R. § 2590.715-2713A(b)(1)(ii), (c)(1); 45 C.F.R. § 147.131(c)(1).

Nos. 14-20112, 14-10241, 14-40212, 14-10661

notice need not take a particular form but must include the name of the organ-ization; a statement that it opposes, on religious grounds, providing coverage for some or all contraceptives; the name and type of the plan; and the name and contact information of the plan's insurer or third-party administrator, if applicable.[13]

The effect of applying for the accommodation depends on the type of plan and method of certification. If an employer with an insured plan uses Form 700, the insurer must exclude the objectionable coverage from the plan and provide "separate payments" for contraceptives for plan participants.[14] The insurer may not impose any direct or indirect costs for contraceptives on the employer or participants.[15] In addition, it must send a notice to participants, separately from plan materials, explaining that the employer does not admin-ister or fund contraceptives but that, instead, the insurer provides separate payments.[16] If an employer with an insured plan submits a notice to HHS, then HHS notifies the insurer of its obligations, which are the same as if the employer had used Form 700.[17]

The process for self-insured plans is somewhat different. If an employer with a self-insured plan uses Form 700, the third-party administrator, if there is one, must either provide separate payments (as an insurer would) or arrange for an insurer or other entity to do so. *See* 29 C.F.R. § 2590.715-2713A(b)(2).

---

[13] *See* 29 C.F.R. § 2590.715-2713A(b)(1)(ii)(B), (c)(1)(ii); 45 C.F.R. § 147.131(c)(1)(ii).

[14] 29 C.F.R. § 2590.715-2713A(c)(2)(i); 45 C.F.R. § 147.131(c)(2)(i).

[15] 26 C.F.R. § 54.9815-2713A(c)(2)(ii); 29 C.F.R. § 2590.715-2713A(c)(2)(ii); 45 C.F.R. § 147.131(c)(2)(ii).

[16] 26 C.F.R. § 54.9815-2713A(d); 29 C.F.R. § 2590.715-2713A(d); 45 C.F.R. § 147.131(d).

[17] *See* 29 C.F.R. § 2590.715-2713A(c)(1)(ii), (2)(i); 45 C.F.R. § 147.131(c)(1)(ii), (2)(i).

Nos. 14-20112, 14-10241, 14-40212, 14-10661

Third-party administrators and insurers that pay for contraceptives in this circumstance are eligible for government reimbursement of 115% of their expenses.[18] The prohibition on imposing costs and the notice requirement are the same as for insured plans.[19] Moreover, the form "shall be an instrument under which the plan is operated, shall be treated as a designation of the third party administrator as the plan administrator under section 3(16) of ERISA for [contraceptives], and shall supersede any earlier designation." *Id.* § 2510.3-16(b).

If an employer with a self-insured plan submits a notice to HHS, then HHS notifies the Department of Labor, which in turn notifies the third-party administrator of its obligations. *See id.* § 2590.715-2713A(b)(1)(ii)(B). The result is the same as if the employer had used Form 700, *id.* § 2590.715-2713A(b)(1)(ii)(B), (2), except that it is the notice from the Department of Labor, instead of Form 700, that is treated as an instrument under which the plan is operated and as designation of the plan administrator, *id.* § 2510.3-16(b).

B.

The plaintiffs are religious organizations that oppose the use of some or all contraceptives. The sincerity of their beliefs is undisputed. The Dioceses of Fort Worth and Beaumont are automatically exempt from the mandate as religious employers, and the other plaintiffs are eligible for the accommodation.

---

[18] 29 C.F.R. § 2590.715-2713A(b)(3); 45 C.F.R. § 156.50(d); Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2015, 79 Fed. Reg. 13744, 13809 (Mar. 11, 2014).

[19] *See* 26 C.F.R. § 54.9815-2713A(d); 29 C.F.R. § 2590.715-2713A(b)(2), (d).

Nos. 14-20112, 14-10241, 14-40212, 14-10661

The plaintiffs in *East Texas Baptist University* are East Texas Baptist University and Houston Baptist University, which have self-insured plans[20] for their employees, and Westminster Theological Seminary, which offers an insured plan to its employees. Houston Baptist University's plan is a church plan, which is exempt from ERISA. The plaintiffs oppose abortion and believe that emergency contraceptives and intrauterine devices, which are included in the contraceptive mandate, can cause abortions. They are unwilling to provide or facilitate access to those products. They sued in the Southern District of Texas, and the court entered partial final judgment[21] and a permanent injunction against the government.

The plaintiffs in *University of Dallas*[22] are several Catholic organizations. The University of Dallas has a self-insured plan for its employees and an insured plan for its students. The Diocese of Fort Worth provides coverage to its employees through a church plan, and Our Lady of Victory Catholic School offers coverage to its employees through the diocese's plan.[23] Catholic Charities, Diocese of Fort Worth, has an insured plan for its employees. The plaintiffs oppose the use of any contraceptives to prevent pregnancy or induce abortion,[24] and providing or facilitating access to them for those purposes

---

[20] All self-insured plans at issue in these appeals have third-party administrators.

[21] The court stayed other claims not at issue on appeal.

[22] The *University of Dallas* and *Diocese of Fort Worth* appeals arise from the same district-court case. We refer to those appeals collectively as "*University of Dallas.*"

[23] The diocese is automatically exempt from the mandate as a religious employer, but Our Lady of Victory is not. The diocese is a plaintiff because it alleges that the regulations will require it either to sponsor a plan that complies with the mandate or to remove Our Lady of Victory from its plan.

[24] The Catholic plaintiffs do not oppose the use of contraceptives to treat medical conditions so long as the purpose is not to prevent pregnancy or induce abortion.

9

Nos. 14-20112, 14-10241, 14-40212, 14-10661

would violate their faith. They sued in the Northern District of Texas, and the court entered preliminary injunctions against the government.

The plaintiffs in *Diocese of Beaumont* are the Diocese of Beaumont, which provides coverage to its employees through a church plan, and Catholic Charities of Southeast Texas, which offers coverage to its employees through the diocese's plan.[25] Like the plaintiffs in *University of Dallas*, they oppose the use of any contraceptives to prevent pregnancy or induce abortion, and they object to providing or facilitating access to them for those purposes. They sued in the Eastern District of Texas, and the court entered final judgment and a permanent injunction against the government.

## II.

We review a summary judgment *de novo*. *LaBarge Pipe & Steel Co. v. First Bank*, 550 F.3d 442, 449 (5th Cir. 2008). We review the grant of a preliminary or permanent injunction for abuse of discretion and the underlying legal conclusions *de novo*.[26]

## III.

Under RFRA, the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless "it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is

---

[25] As with the Diocese of Fort Worth and Our Lady of Victory, the diocese is automatically exempt from the mandate as a religious employer, but Catholic Charities is not. The diocese is a plaintiff because it alleges that the regulations will require it either to sponsor a plan that complies with the mandate or to remove Catholic Charities from its plan.

[26] *See Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 528 (5th Cir. 2013) (en banc) (permanent injunction), *cert. denied*, 134 S. Ct. 1491 (2014); *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 195 (5th Cir. 2003) (preliminary injunction).

Nos. 14-20112, 14-10241, 14-40212, 14-10661

the least restrictive means of furthering that compelling governmental inter-est." 42 U.S.C. § 2000bb-1(a) to (b). We begin and end our analysis with the substantial-burden prong.[27] The plaintiffs must show that the challenged regulations substantially burden their religious exercise,[28] but they have not done so or, in *University of Dallas*, have not established a substantial likeli-hood of doing so. Because their claims fail on the merits, we need not consider the other requirements for an injunction.[29]

## A.

A preliminary question—at the heart of this case—is the extent to which the courts defer to a religious objector's view on whether there is a substantial burden. The inquiry has three components: (1) What is the adherent's religi-ous exercise? (2) Does the challenged law pressure him to modify that exercise? (3) Is the penalty for noncompliance substantial? It is well established that the court accepts the objector's answer to the first question upon finding that

---

[27] Westminster claims that the government waived its argument on this issue by fail-ing to present it to the district court. We disagree. The government explained at length why it believes that the regulations do not substantially burden the plaintiffs' religious exercise.

[28] *See City of Boerne*, 521 U.S. at 533–34 (noting that the burden is on the religious objector); *Diaz v. Collins*, 114 F.3d 69, 71–72 (5th Cir. 1997) (same).

[29] "To be entitled to a preliminary injunction, the applicant must show (1) a substan-tial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *Lake Charles Diesel*, 328 F.3d at 195–96. "[A] plaintiff seeking a permanent injunction must . . . demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Nos. 14-20112, 14-10241, 14-40212, 14-10661

his beliefs are sincerely held and religious.[30]  It is also undeniable that the court evaluates the third question as one of law.[31]  Although we have not directly addressed who decides the second question,[32] all of our sister circuits that have considered contraceptive-mandate cases have come to the same conclusion:  The court makes that decision.[33]  We agree.

Two free-exercise cases are especially instructive.[34]  In *Bowen v. Roy*, 476

---

[30] *See, e.g.*, *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2777–79 (2014); *Thomas v. Review Bd.*, 450 U.S. 707, 713–16 (1981).

[31] *See, e.g.*, *Hobby Lobby*, 134 S. Ct. at 2775–77; *Sherbert v. Verner*, 374 U.S. 398, 403–06 (1963).

[32] East Texas Baptist University cites two Fifth Circuit cases applying the Texas version of RFRA, but those decisions merely confirmed that the court defers to the adherent's answer to the first question upon finding that his beliefs are sincerely held and religious.  *See A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 263–66 (5th Cir. 2010); *Merced v. Kasson*, 577 F.3d 578, 590–91 (5th Cir. 2009).

[33] *See Univ. of Notre Dame v. Burwell*, No. 13-3853, 2015 WL 2374764, at *6 (7th Cir. May 19, 2015) ("Although Notre Dame is the final arbiter of its religious beliefs, it is for the courts to determine whether the law actually forces Notre Dame to act in a way that would violate those beliefs."); *Geneva Coll. v. Sec'y U.S. Dep't of Health & Human Servs.*, 778 F.3d 422, 435 (3d Cir.) ("Without testing the appellees' religious beliefs, we must nonetheless objectively assess whether the appellees' compliance with the self-certification procedure does, in fact, trigger, facilitate, or make them complicit in the provision of contraceptive coverage."), *mandate recalled and stayed sub nom. Zubik v. Burwell*, 135 S. Ct. 1544 (2015); *Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 247 (D.C. Cir. 2014) ("Accepting the sincerity of Plaintiffs' beliefs, however, does not relieve this Court of its responsibility to evaluate the substantiality of any burden on Plaintiffs' religious exercise, and to distinguish Plaintiffs' duties from obligations imposed, not on them, but on insurers and [third-party administrators].  Whether a law substantially burdens religious exercise under RFRA is a question of law for courts to decide, not a question of fact.").  The Sixth Circuit used the same approach in a pre-*Hobby Lobby* case, but the Supreme Court has since vacated and remanded that decision for reconsideration in light of *Hobby Lobby*.  *See Mich. Catholic Conference & Catholic Family Servs. v. Burwell*, 755 F.3d 372, 385 (6th Cir. 2014) ("[A]lthough we acknowledge that the appellants believe that the regulatory framework makes them complicit in the provision of contraception, we will independently determine what the regulatory provisions require and whether they impose a substantial burden on appellants' exercise of religion."), *cert. granted and judgment vacated sub nom. Mich. Catholic Conference v. Burwell*, 135 S. Ct. 1914 (2015).

[34] Congress passed RFRA in response to *Employment Division v. Smith*, 494 U.S. 872 (1990), and one of the statute's purposes is "to restore the compelling interest test as set forth

Nos. 14-20112, 14-10241, 14-40212, 14-10661

U.S. 693 (1986), parents challenged the government's use of a Social Security number for their daughter because they believed that the use of the number would "rob her spirit." *Id.* at 695–97. The Court ruled for the government, reasoning that the parents were challenging the government's acts, not a burden on them, *id.* at 699–701, and that "[t]he Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens," *id.* at 699. The Court decided for itself whether the policy in question pressured the parents to modify their religious exercise, noting that, although

> Roy's religious views may not accept this distinction between individual and governmental conduct[,] [i]t is clear . . . that the Free Exercise Clause, and the Constitution generally, recognize such a distinction; for the adjudication of a constitutional claim, the Constitution, rather than an individual's religion, must supply the frame of reference.

*Id.* at 701 n.6 (citation omitted).

The Court used the same approach in *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988). The plaintiffs complained of the government's plan to construct a road and permit logging on federal land, which they had used for religious purposes. *Id.* at 441–42. Relying on *Roy*, the Court rejected their claim. *Id.* at 447–49. It accepted the plaintiffs' statement of their religious beliefs, *id.* at 449–51, but concluded that the project involved only the government's management of its own property, which did not implicate the plaintiffs' constitutional rights, *id.* at 453. The Court stressed that, "[w]hatever may be the exact line between unconstitutional prohibitions

---

in [*Sherbert*, 374 U.S. 398,] and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)[,] and to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b)(1). Accordingly, pre-*Smith* caselaw is relevant in interpreting RFRA. *See, e.g.*, *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465 *passim* (5th Cir. 2014); *Tagore v. United States*, 735 F.3d 324, 330 (5th Cir. 2013).

13

on the free exercise of religion and the legitimate conduct by government of its own affairs, the location of the line cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development." *Id.* at 451.

In addition, one RFRA case from the District of Columbia Circuit illustrates that the court decides the second question. In *Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008), an inmate objected to a requirement that he participate in the collection of a tissue sample, which the FBI would use to create a DNA profile, because he opposed on religious grounds the extraction and storage of DNA information. *Id.* at 673–74. The court ruled for the government. *Id.* at 686. It "[a]ccept[ed] as true the factual allegations that Kaemmerling's beliefs are sincere and of a religious nature—but not the legal conclusion, cast as a factual allegation, that his religious exercise is substantially burdened." *Id.* at 679. Applying that rule, it held that his religious exercise was not substantially burdened, because "[t]he extraction and storage of DNA information are entirely activities of the FBI, in which Kaemmerling plays no role and which occur after the BOP has taken his fluid or tissue sample (to which he does not object)." *Id.*

The Court did not address the issue in *Hobby Lobby*. There, closely held for-profit corporations challenged the contraceptive mandate based on their owners' religious opposition to some contraceptives. *Id.* at 2764–66. The corporations were neither automatically exempt from the mandate as religious employers nor eligible for the accommodation; they had to offer insurance that covered contraceptives or face large penalties. *Id.* at 2775–76. The Court held that the mandate violated RFRA as applied to the corporations. *Id.* at 2785. The substantial-burden analysis addressed only the first and third questions.

14

Nos. 14-20112, 14-10241, 14-40212, 14-10661

The Court rejected the government's theory "that the connection between what the objecting parties must do (provide health-insurance coverage for [contraceptives]) and the end that they find to be morally wrong (destruction of an embryo) is simply too attenuated," *id.* at 2777, explaining that drawing the line between acceptable and unacceptable levels of involvement was the owners' prerogative, *id.* at 2778–79. In doing so, the Court reaffirmed that courts defer to the objector's description of his religious exercise upon finding that his beliefs are sincerely held and religious. And the Court analyzed the substantiality of the penalties for noncompliance itself, rather than automatically accepting the corporations' position. *Id.* at 2775–77.

But the Court said nothing about the second question. It had no reason to, because there was no doubt that imposing large penalties for not offering insurance that covered contraceptives pressured the corporations to facilitate the use of contraceptives.

In the absence of further guidance from the Supreme Court, we are bound to follow *Roy* and *Northwest Indian Cemetery* by deciding, as a question of law, whether the challenged law pressures the objector to modify his religious exercise. The other circuits' decisions confirm the continued vitality of that approach.[35]

## B.

Although the plaintiffs have identified several acts that offend their religious beliefs, the acts *they* are required to perform do not include providing or facilitating access to contraceptives. Instead, the acts that violate their faith

---

[35] *See Notre Dame*, 2015 WL 2374764, at *6; *Geneva*, 778 F.3d at 435; *Priests for Life*, 772 F.3d at 247; *Kaemmerling*, 553 F.3d at 679.

are those of third parties. Because RFRA confers no right to challenge the independent conduct of third parties, we join our sister circuits in concluding that the plaintiffs have not shown a substantial burden on their religious exercise.[36]

First, the plaintiffs claim that their completion of Form 700 or submission of a notice to HHS will authorize or trigger payments for contraceptives. Not so. The ACA already requires contraceptive coverage: "A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for . . . with respect to women, such additional preventive care . . . as provided for in comprehensive guidelines" promulgated by HHS, 42 U.S.C. § 300gg-13(a)(4), which includes contraceptives.[37] That provision expressly requires insurers to offer coverage.

---

[36] *See Notre Dame*, 2015 WL 2374764, at *6 ("As far as we can determine from the very limited record, the only 'conduit' [for payments for contraceptives] is between the [insurer and the third-party administrator] and Notre Dame students and staff; the university has stepped aside."); *Geneva*, 778 F.3d at 438 ("By participating in the accommodation, the eligible organization has no role whatsoever in the provision of the objected-to contraceptive services."); *Priests for Life*, 772 F.3d at 256 ("It is as a result of the ACA, and not because of any actions Plaintiffs must take, that Plaintiffs' employees are entitled to contraceptive coverage provided by third parties and that their insurers or TPA must provide it; RFRA does not entitle Plaintiffs to control their employees' relationships with other entities willing to provide health insurance coverage to which the employees are legally entitled. A religious adherent's distaste for what the law requires of a third party is not, in itself, a substantial burden; that is true even if the third party's conduct towards others offends the religious adherent's sincere religious sensibilities."). The Sixth Circuit reached the same result in its now-vacated decision. *See Mich. Catholic*, 755 F.3d at 390 ("The appellants allege that providing, paying for, and/or facilitating access to contraceptive coverage burdens their exercise of religion. . . . [T]he exemption and accommodation framework does not require them to do any of these things. The framework does not permit them to prevent their insurance issuer or third-party administrator from providing contraceptive coverage to their employees pursuant to independent obligations under federal law. However, the inability to 'restrain the behavior of a third party that conflicts with the [appellants'] religious beliefs,' does not impose a burden on the appellants' exercise of religion." (alteration in original) (citation omitted) (quoting *Mich. Catholic Conference v. Sebelius*, 989 F. Supp. 2d 577, 587 (W.D. Mich. 2013))).

[37] Group Health Plans and Health Insurance Insurers, 77 Fed. Reg. at 8725–26.

Nos. 14-20112, 14-10241, 14-40212, 14-10661

And although it does not specifically mention third-party administrators, they administer "group health plan[s]," which must include coverage. Nothing suggests the insurers' or third-party administrators' obligations would be waived if the plaintiffs refused to apply for the accommodation. Accordingly, the plaintiffs' completion of Form 700 or submission of a notice to HHS does not authorize or trigger payments for contraceptives, because the plaintiffs cannot authorize or trigger what others are already required by law to do.[38]

The plaintiffs offer two variations of that theory, but those are equally unconvincing. The plaintiffs assert that their listing the names and contact information of their insurers and third-party administrators will make it easier for the government to inform those entities of their obligations. It will, but that does not mean the plaintiffs' religious exercise is burdened. Without the accommodation, the plaintiffs would have to offer a plan that covered contraceptives,[39] so the effect of the government's communications with the insurers and third-party administrators is to shift the burden to those entities. Providing the names and contact information facilitates only the plaintiffs' exemption, not contraceptive coverage.

Separately, the self-insured plaintiffs contend that their completion of Form 700 or submission of a notice to HHS will make their third-party administrators eligible for the government's reimbursement. Again, it will,[40] but that does not mean the plaintiffs' religious exercise is burdened.

---

[38] *See Notre Dame*, 2015 WL 2374764, at \*7–9 (concluding that federal law, not the completion of Form 700 or submission of a notice to HHS, triggers payments for contraceptives); *Geneva*, 778 F.3d at 435–42 (same); *Priests for Life*, 772 F.3d at 252–56 (same).

[39] *See* 26 U.S.C. §§ 4980H(a), (c)(2), 5000A(f)(2); 42 U.S.C. § 300gg-13(a)(4); Group Health Plans and Health Insurance Insurers, 77 Fed. Reg. at 8725–26.

[40] *See* 29 C.F.R. § 2590.715-2713A(b)(3); 45 C.F.R. § 156.50(d).

Nos. 14-20112, 14-10241, 14-40212, 14-10661

For the insured plans, the insurers will not lose money by paying for contraceptives, because the savings on pregnancy care at least are expected to equal the costs of contraceptives.[41] There is a potential problem for the self-insured plans, though: The third-party administrators do not bear the risk of claims, so they will not realize any savings on pregnancy care. The regulations prohibit passing on the costs of contraceptives, 29 C.F.R. § 2590.715-2713A(b)(2), but in an efficient market, the third-party administrators would be unable to avoid doing so without additional revenue. The reimbursement is the government's attempt to solve the problem by giving the third-party administrators additional money to cover the costs of contraceptives. Assuming the amount is sufficient, the reimbursement is what will allow the self-insured plaintiffs to avoid paying for contraceptives.

Second, the plaintiffs urge that the accommodation uses their plans as vehicles for payments for contraceptives. But that is just what the regulations prohibit. Once the plaintiffs apply for the accommodation, the insurers may not include contraceptive coverage in the plans.[42] The insurers and third-party administrators may not impose any direct or indirect costs for contraceptives on the plaintiffs[43]; they may not send materials about contraceptives together with plan materials[44]; in fact, they must send plan participants a notice

---

[41] Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. 39870, 39877 (July 2, 2013).

[42] 29 C.F.R. § 2590.715-2713A(c)(2)(i)(A); 45 C.F.R. § 147.131(c)(2)(i)(A).

[43] 26 C.F.R. § 54.9815-2713A(c)(2)(ii); 29 C.F.R. § 2590.715-2713A(b)(2), (c)(2)(ii); 45 C.F.R. § 147.131(c)(2)(ii).

[44] 26 C.F.R. § 54.9815-2713A(d); 29 C.F.R. § 2590.715-2713A(d); 45 C.F.R. § 147.131(d).

18

Nos. 14-20112, 14-10241, 14-40212, 14-10661

explaining that the plaintiffs do not administer or fund contraceptives.[45]  The payments for contraceptives are completely independent of the plans.[46]

Third, the plaintiffs theorize that the requirement that they offer their employees a group health plan pressures them to authorize or facilitate the use of contraceptives.  They must contract with the insurers and third-party administrators to offer a plan, and those entities pay for contraceptives.  In the plaintiffs' view, the insurers and third-party administrators would not do so absent the contracts, so the contracts facilitate the use of contraceptives.

The plaintiffs misunderstand the role of the contracts.  Under the accommodation, the contracts are solely for services to which the plaintiffs do not object; the contracts do not provide for the insurers and third-party administrators to cover contraceptives, do not make it easier for those entities to pay for contraceptives, and do not imply endorsement of contraceptives.  *See supra* notes 42–46 and accompanying text.  Instead, the plaintiffs are excluding contraceptive coverage from their plans and expressing their disapproval of it, but the government is requiring the insurers and third-party administrators to offer it—separately from the plans—despite the plaintiffs' opposition.  The plaintiffs' religious beliefs forbid them from providing or facilitating access to contraceptives, but the requirement that they enter into the contracts does not force them to do so.  The acts that violate their faith are the acts of the government, insurers, and third-party administrators, but RFRA does not

---

[45] 26 C.F.R. § 54.9815-2713A(d); 29 C.F.R. § 2590.715-2713A(d); 45 C.F.R. § 147.131(d).

[46] *See Notre Dame*, 2015 WL 2374764, at *5–7 (explaining that the accommodation does not use the plans as vehicles for payments for contraceptives); *Geneva*, 778 F.3d at 438, 441 (same); *Priests for Life*, 772 F.3d at 253–54 (same).

entitle them to block third parties from engaging in conduct with which they disagree.[47]

A hypothetical illustrates the breadth of the plaintiffs' position. Suppose a person needs a passport for an upcoming trip. She fills out the application, but as she is about to mail it, she learns that the State Department will assign her a number when it approves her request. She opposes, on religious grounds, the use of a number to identify her, *see generally Roy*, 476 U.S. at 695–97, as well as any act that would facilitate the use of a number, so she sues under RFRA.

That case is indistinguishable from the one at bar. The objector does not oppose completing the application but only the State Department's assigning her a number in response even though she need not help the department do so. The idea that she could force the department to justify, under strict scrutiny, its application requirement or use of a number is unreasonable. Yet the plaintiffs here are making the same type of claim. Accepting such claims could subject a wide range of federal programs to strict scrutiny. Perhaps an applicant for Social Security disability benefits disapproves of working on Sundays and is unwilling to assist others in doing so. He could challenge a requirement that he use a form to apply because the Social Security Administration might process it on a Sunday.[48] Or maybe a pacifist refuses to complete a form to

---

[47] *See Nw. Indian Cemetery*, 485 U.S. at 453 (holding that an adherent was not entitled to challenge a third party's actions that offended his beliefs); *Roy*, 476 U.S. at 701 (same); *Notre Dame*, 2015 WL 2374764, at *5–7 (concluding that the requirement to offer a plan does not impose a substantial burden, because the contracts with the insurers and third-party administrators do not facilitate the use of contraceptives); *Geneva*, 778 F.3d at 438 n.13 (same); *Priests for Life*, 772 F.3d at 253 (same); *Kaemmerling*, 553 F.3d at 679 (holding that an adherent was not entitled to challenge a third party's actions that offended his beliefs).

[48] *See generally Geneva*, 778 F.3d at 439 n.14 (considering an analogous hypothetical).

Nos. 14-20112, 14-10241, 14-40212, 14-10661

indicate his beliefs because that information would enable the Selective Service to locate eligible draftees more quickly.[49]  The possibilities are endless, but we doubt Congress, in enacting RFRA, intended for them to be.

The Court did not resolve the issue in *Hobby Lobby* but, instead, rejected the government's notion that there was no substantial burden, because the intervening acts of third parties, such as employees' decisions to use contraceptives, made the connection between the plaintiffs' providing contraceptive coverage and the destruction of an embryo too attenuated.  134 S. Ct. at 2777–79.  The distinction between that case and the instant one is that the regulations compelled the *Hobby Lobby* plaintiffs to participate in providing contraceptives, albeit in an indirect way.  What the regulations require of the plaintiffs here has nothing to do with providing contraceptives.

The difference is not just that there are more links in the causal chain here than in *Hobby Lobby*—a difference that would not change the outcome, given that we accept an adherent's judgment as to how much separation is enough.[50]  It is also that the type of compelled act is quite different—the act at issue in this case is not one that authorizes or facilitates the use of contraceptives.

The *Hobby Lobby* Court did not consider this type of situation and actually suggested in *dictum* that the accommodation does not burden religious exercise:  The majority noted that "HHS has effectively exempted certain religious nonprofit organizations" through the accommodation, *id.* at 2763, and

---

[49] *See generally Notre Dame*, 2015 WL 2374764, at *18 (discussing a similar hypothetical).

[50] *See, e.g.*, *Hobby Lobby*, 134 S. Ct. at 2779; *Thomas*, 450 U.S. at 715.

the concurrence observed that "the accommodation equally furthers the Government's interest but does not impinge on the plaintiffs' religious beliefs," *id.* at 2786 (Kennedy, J., concurring).[51]  Thus, *Hobby Lobby* is of no help to the plaintiffs' position, and the requirement to offer a group health plan does not burden their religious exercise.

Fourth, the self-insured plaintiffs postulate that they will be required to pay for contraceptives despite the regulations to the contrary.  They say the government lacks the authority under ERISA to prohibit third-party administrators from passing on the costs, insurers are unlikely to work with the third-party administrators because of the small amounts involved (an insurer must seek reimbursement on behalf of a third-party administrator[52]), and the 115% reimbursement will not cover the costs.

This issue is not ripe, and we express no view on its merits.  "A court should dismiss a case for lack of 'ripeness' when the case is abstract or hypothetical."[53]  "The key considerations are 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'"[54] "A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required."[55]  "However, 'even where an issue presents purely legal questions, the plaintiff must

---

[51] The Court cautioned that it did "not decide . . . whether [the accommodation] complies with RFRA for purposes of all religious claims."  *Hobby Lobby*, 134 S. Ct. at 2782.

[52] 29 C.F.R. § 2590.715-2713A(b)(3); 45 C.F.R. § 156.50(d).

[53] *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012) (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586 (5th Cir. 1987)).

[54] *Id.* (quoting *New Orleans*, 833 F.2d at 586).

[55] *Id.* (quoting *New Orleans*, 833 F.2d at 587).

Nos. 14-20112, 14-10241, 14-40212, 14-10661

show some hardship in order to establish ripeness.'"[56]

The plaintiffs' prediction that third-party administrators will attempt to charge them for contraceptives may not come to pass, so the matter is not fit for judicial decision. The administrative costs associated with payments for contraceptives may turn out to be low. If so, the insurers and third-party administrators will be eager to take advantage of the 115% reimbursement,[57] and the third-party administrators will profit from the arrangement and have no occasion to pass on the costs. The plaintiffs say that is unlikely because only a small number of their employees will use contraceptives. But their reasoning overlooks the economies of scale that the insurers and third-party administrators could establish by paying for contraceptives for the employees of many religious organizations.

On this record, there is no basis for assessing which outcome is most likely. And withholding court consideration would not harm the plaintiffs. There is no allegation that any third-party administrator has asked the plaintiffs to pay for contraceptives. If that happened, the plaintiffs could challenge the regulations then and would have had to pay nothing in the meantime. As a result, we decline to reach the issue.

Fifth, the two dioceses, which are automatically exempt from the mandate as religious employers, submit that the regulations will require them either to sponsor a plan that complies with the contraceptive mandate or to remove from their plans affiliated entities that are not religious employers but are eligible for the accommodation. That is a misreading of the regulations,

---

[56] *Id.* (quoting *Cent. & S. W. Servs., Inc. v. U.S. EPA*, 220 F.3d 683, 690 (5th Cir. 2000)).

[57] *See Notre Dame*, 2015 WL 2374764, at *7 (speculating as to why insurers and third-party administrators might want to participate in the scheme).

which allow those types of organizations to share a plan provided that the entity that does not qualify as a religious employer applies for the accommodation.[58] Because the accommodation does not burden the plaintiffs' religious exercise, neither does a requirement that the dioceses do nothing and the affiliated entities apply for the accommodation.[59]

In short, the acts *the plaintiffs* are required to perform do not involve providing or facilitating access to contraceptives, and the plaintiffs have no right under RFRA to challenge the independent conduct of third parties. Because the plaintiffs have not shown that the regulations substantially burden their religious exercise or, in *University of Dallas*, have not demonstrated a substantial likelihood of doing so, we need not reach the strict-scrutiny prong or the other requirements for an injunction.

REVERSED.

---

[58] *See* Coverage of Certain Preventive Services, 78 Fed. Reg. at 39886.

[59] *See Geneva*, 778 F.3d at 443–44 (explaining that the different treatment of dioceses and affiliated organizations does not impose a substantial burden).