RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0202p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

MICHIGAN CATHOLIC CONFERENCE and CATHOLIC FAMILY SERVICES D/B/A CATHOLIC CHARITIES DIOCESE OF KALAMAZOO (13-2723); THE CATHOLIC DIOCESE OF NASHVILLE, CATHOLIC CHARITIES OF TENNESSEE, INC., CAMP MARYMOUNT, INC., MARY, QUEEN OF ANGELS, INC., ST. MARY VILLA, INC., DOMINICAN SISTERS OF ST. CECILIA CONGREGATION, and AQUINAS COLLEGE (13-6640),

> *Plaintiffs-Appellants*,

*v.*

SYLVIA MATTHEWS BURWELL, Secretary of the United States Department of Health and Human Services, THOMAS E. PEREZ, Secretary of the United States Department of Labor, JACOB J. LEW, Secretary of the United States Department of Treasury, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, and UNITED STATES DEPARTMENT OF THE TREASURY,

> *Defendants-Appellees*.

Nos. 13-2723/6640

_____

Appeal from the United States District Court for the
Western District of Michigan at Grand Rapids.
No. 1:13-cv-01247—Gordon J. Quist, District Judge.

Appeal from the United States District Court for the
Middle District of Tennessee at Nashville.
No: 3:13-cv-01303—Todd J. Campbell, Chief District Judge.

Decided and Filed:  August 21, 2015

Before:  MOORE and ROGERS, Circuit Judges; NIXON, District Judge.[*]

_____

[*]The Honorable John T. Nixon, United States District Judge for the Middle District of Tennessee, sitting by designation.

———————————

**COUNSEL**

———————————

**ON BRIEF:** Matthew A. Kairis, JONES DAY, Columbus, Ohio, for Appellants. Adam C. Jed, Mark B. Stern, Alisa B. Klein, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge. The Patient Protection and Affordable Care Act ("ACA") requires health insurance plans to provide coverage for contraception—a requirement commonly known as the contraceptive mandate. Religious employers, employers with fewer than fifty employees, and grandfathered plans are exempt from this mandate. Non-profit entities and closely held corporations who object to the mandate on religious grounds may seek an accommodation. That accommodation effectively insulates these entities from the contraception-provision process: they no longer have to pay for contraceptive coverage, and all individuals under their plans are notified of the entity's religious objections. The insurance issuers and third party administrators for these entities, however, must continue to provide coverage for contraceptives to individuals insured under these plans.

Plaintiffs in this case include both religious employers eligible for the exemption and non-profit entities eligible for the accommodation. In the first instance, Plaintiffs challenged both the exemption and the accommodation. They sought a preliminary injunction, arguing that these provisions were being enforced in violation of their rights under the Religious Freedom Restoration Act ("RFRA"), the First Amendment, and the Administrative Procedure Act ("APA"). We rejected this challenge, holding that the district courts did not abuse their discretion in denying Plaintiffs preliminary injunctive relief. *Mich. Catholic Conference & Catholic Family Servs. v. Burwell*, 755 F.3d 372 (6th Cir. 2014). Plaintiffs then filed a petition for a writ of certiorari; that petition made clear that Plaintiffs were not challenging our decision with respect to the exemption. Nor did the petition make reference to any of the First Amendment or APA arguments that Plaintiffs had previously raised. Rather, the petition focused

entirely on whether the accommodation violated Plaintiffs' rights under RFRA. The Supreme Court granted this petition, vacated our judgment, and remanded the case back to us "for further consideration in light of *Burwell v. Hobby Lobby Stores, Inc.*" *Mich. Catholic Conference v. Burwell*, 135 S. Ct. 1914 (2015).

In *Hobby Lobby*, 134 S. Ct. 2751 (2014), the Supreme Court determined that closely held, for-profit companies with sincerely held religious beliefs could not be compelled to provide contraceptive coverage to their employees. In reaching this decision, the Court discussed the accommodation favorably, noting for instance that the accommodation served the government's interests in providing access to contraception while at the same time not impinging on the religious beliefs of objecting non-profits. The Court did not suggest that the accommodation violated RFRA.

After carefully reviewing the *Hobby Lobby* opinion, we adhere to our original disposition. This opinion now addresses the impact of *Hobby Lobby* and the relevant circuit court decisions that have been published since *Hobby Lobby*. We join our sister circuits in holding (1) that the accommodation provision does not violate RFRA and (2) that nothing in *Hobby Lobby* changes this conclusion. Accordingly, we AFFIRM the district courts' judgments denying Plaintiffs preliminary injunctive relief on all of their claims. We also RE-ISSUE and RE-AFFIRM our prior opinion in order to address all remaining issues, including Plaintiffs' First Amendment and APA challenges to both the exemption and the accommodation.

## I. BACKGROUND

### A. Factual Background[1]

There are nine Plaintiffs in this case, listed below:

- Michigan Catholic Conference ("MCC")

- Catholic Charities Diocese of Kalamazoo ("Catholic Charities of Kalamazoo")

- Catholic Diocese of Nashville ("CDN")

---

[1]We have already set forth background of this appeal in detail, *see Mich. Catholic Conference*, 755 F.3d at 378–82, and take only a moment to summarize the most salient facts.

- Catholic Charities of Tennessee, Inc. ("Catholic Charities of Tennessee")

- Camp Marymount, Inc. ("Camp Marymount")

- Mary, Queen of Angels, Inc. ("MQA")

- St. Mary Villa, Inc. ("St. Mary Villa")

- Aquinas College

- Dominican Sisters of St. Cecilia Congregation ("St. Cecilia Congregation")

Some of these Plaintiffs are eligible for the exemption, others for the accommodation. These provisions work slightly differently from one another. *See Little Sisters of the Poor Home for the Aged v. Burwell*, __ F.3d ___, 2015 WL 4232096, at *5–*8 (10th Cir. July 14, 2015).

**1.  The Exemption**

Under the exemption, religious employers (as defined by federal law[2]) do not need to provide contraceptive coverage to individuals covered under their insurance plans.  These employers did not need to provide or pay for (or have their insurance issuer provide or pay for) contraceptive coverage prior to the enactment of the ACA, and they do not need to do so now. There is no need for them to object to the contraceptive mandate because, for these entities, nothing has changed.  Three Plaintiffs in this case (MCC, CDN, and St. Cecilia Congregation) are eligible for the exemption. *See Mich. Catholic Conference*, 755 F.3d at 385.

---

[2]The regulatory framework behind the exemption is somewhat complex.  First, 45 C.F.R. § 147.131(a) provides that "the Health Resources and Services Administration may establish an exemption from such guidelines with respect to a group health plan established or maintained by a religious employer (and health insurance coverage provided in connection with a group health plan established or maintained by a religious employer) with respect to any requirement to cover contraceptive services under such guidelines."

That regulation, in turn, implicates 76 Fed. Reg. 46,621 (Aug. 3, 2011), "Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act."  This provision proposed to define "religious employer" as follows:  "a religious employer is one that:  (1) Has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a non-profit organization under section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Code." *Id.* at 46,623.

After reviewing hundreds of thousands of comments to this proposed definition, the federal government adopted this definition into law in February 2012. *See* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8727 (Feb. 15, 2012).

## 2. The Accommodation

The accommodation applies to objecting non-profit entities and—in the wake of *Hobby Lobby*—to closely held, for-profit corporations as well. None of the remaining Plaintiffs are closely held corporations; they fall within the accommodation because they are non-profits that object to the contraceptive mandate. Of these six Plaintiffs, five offer a "fully-insured group health plan[]": Catholic Charities of Tennessee, Camp Marymount, MQA, St. Mary Villa, and Aquinas College. *Id.* at 379. Only one—Catholic Charities of Kalamazoo—offers a self-insured plan. *Id.* at 386 n.10. Fully-insured group health plans operate somewhat differently from self-insured health plans—with different implications for the contraceptive mandate. *See, e.g.*, *Little Sisters of the Poor*, 2015 WL 4232096, at *8–*10; *E. Tex. Baptist Univ. v. Burwell*, __ F.3d ____, 2015 WL 3852811, at *2 (5th Cir. June 22, 2015).

### a. Fully-Insured Plans vs. Self-Insured Plans

Under a fully-insured group plan (also known as a fully-insured plan or an insured plan), "insurance [for the non-profit entity] is purchased from a regulated insurance company." *Mich. Catholic Conference*, 755 F.3d at 379 n.4 (quoting 1A Steven Plitt, et al., *Couch on Insurance* § 10.1 n.1 (3d ed. 2013)). Typically, "the employer pays a per-employee premium to an insurance company, and the insurance company assumes the risk of providing health coverage for insured events." *Health Plan Differences: Fully-Insured vs. Self-Insured*, EMP. BENEFIT RESEARCH INST., Fast Facts from EBRI (Feb. 11, 2009), http://www.ebri.org/pdf/FFE114.11Feb09.Final.pdf ("Fast Facts from EBRI").

Under a self-insured health plan, "benefits are paid from contributions supplied by the employer without the assistance of outside insurance." *Mich. Catholic Conference*, 755 F.3d at 378 n.2 (quoting 1A Steven Plitt, et al., *Couch on Insurance* § 10.1 n.1). Thus, employers "bear[] the financial risk of paying claims." *Id.* (quoting Government Br. at 7 n.1); *see also* Fast Facts from EBRI ("In a self-insured plan, instead of purchasing health insurance from an insurance company and paying the insurer a per-employee premium, the employer acts as its own insurer."). "Self-insured plans often contract with an insurance company or other third party to administer the plan, but the employer bears the risk associated with offering health benefits." Fast Facts from EBRI.

### b. Complying with the Contraceptive Mandate

For entities that offer a fully-insured plan, the contraceptive mandate works by requiring the insurance company to provide contraceptive coverage without cost-sharing to insured individuals. *See* 42 U.S.C. §§ 300gg-13. The process is straightforward for non-objecting entities: the insurance company provides contraceptive coverage to individuals under the plan, and the non-objecting entity pays for that coverage through the premium that it is charged.

If an eligible non-profit entity objects to such coverage, it must make its objections known, either through a self-certification procedure or by notifying the Secretary of Health and Human Services. *See* 45 C.F.R. § 147.131(c)(1). We describe these procedures in greater detail below. After the eligible non-profit entity objects, "the [insurance] issuer may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries." 45 C.F.R. § 147.131(c)(2)(ii). Instead, "[t]he [insurance] issuer must segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive services." *Id.* In addition, the insurance company must send notice to plan participants, separately from regular plan materials, explaining that the employer does not administer or fund contraceptives but that the insurance company provides separate payments for these services. 45 C.F.R. § 147.131(d).

Under a fully-insured plan, the obligations of the insurance company *remain the same*, regardless of whether the non-profit entity that it works with objects to contraceptive coverage. If a non-profit entity does not object, the insurance company must, as a matter of federal law, provide contraceptive coverage to insured individuals without cost-sharing. If a non-profit entity does object, the insurance company must, as a matter of federal law, provide contraceptive coverage to insured individuals without cost-sharing. The sole point of difference between an entity that decides to exercise the accommodation and an entity that does not is who must pay for the coverage: the insurance company (if the entity objects) or the entity (if the entity does not object).

The contraceptive mandate works differently vis-à-vis self-insured plans. Under these plans, employers bear the risk associated with offering health benefits to their employees. "In [its] simplest form, the employer uses the money that it would have paid the insurance company and instead directly pays health care claims to providers." Fast Facts from EBRI. Functionally, however, most companies work with a third-party administrator ("TPA"), which "perform[s] functions such as developing networks of providers, negotiating payment rates, and processing claims." *Mich. Catholic Conference*, 755 F.3d at 378 n.2 (quoting Government Br. at 7 n.1). Here, Catholic Charities of Kalamazoo works with TPAs Blue Cross Blue Shield of Michigan and Express Scripts.

For non-objecting self-insured entities, compliance with the mandate is fairly straightforward. An insured individual seeks coverage, the TPA processes the claim, and the entity pays for that claim. Objecting self-insured entities, on the other hand, must make their concerns known, through the same procedures provided for fully-insured plans. After the objecting entity does so, responsibility shifts to the TPA: the TPA must now provide contraceptive coverage to insured individuals. The federal government will reimburse TPAs for their expenses for providing such coverage. *See* 45 C.F.R. § 156.50(d). As with fully-insured plans, the TPAs must give notice to plan participants explaining that the employer does not administer or fund contraceptives but that the services are nonetheless provided for and covered by the TPA. 29 C.F.R. § 2590.715-2713A(d). The table below makes clear where each Plaintiff in this case stands.

| | *Eligible for Accommodation* | | *Eligible for Exemption* |
|---|---|---|---|
| ***Fully-Insured*** | Catholic Charities of Tennessee | | MCC |
| | Camp Marymount | | CDN |
| | MQA | | St. Cecilia Congregation |
| | St. Mary Villa | | |
| | Aquinas College | | |
| ***Self-Insured*** | Catholic Charities of Kalamazoo | | |

### c. Exercising the Accommodation

Objecting entities may exercise the accommodation in one of two ways.  The first procedure requires the entity to fill out a two-page form, EBSA Form 700.  This form requires organizations to list three pieces of information:  the "[n]ame of the objecting organization," the "[n]ame and title of the individual who is authorized to make, and makes, this certification on behalf of the organization," and the "[m]ailing and email addresses and phone number for the individual listed above."   EBSA Form 700, U.S. DEP'T OF LABOR, *available at* http://www.dol.gov/ebsa/healthreform/regulations/coverageofpreventiveservices.html.   EBSA Form 700 also requires that the organization self-certify that it is eligible for and seeks to exercise the accommodation.  *See Mich. Catholic Conference*, 755 F.3d at 381 (describing criteria for eligibility).[3]  "The organization or its plan using this form must provide a copy of this certification to the plan's health insurance issuer (for insured health plans) or a third party administrator (for self-insured health plans) in order for the plan to be accommodated with respect to the contraceptive coverage requirement."  EBSA Form 700.  This completes the self-certification process.

Objecting entities may also opt for a second approach:  providing notice directly to the Secretary of Health and Human Services.  This alternative emerged in the aftermath of the Supreme Court's order on application for an injunction in *Wheaton College v. Burwell*, 134 S. Ct. 2806, 2807 (2014), where the Court held in an interim order that objecting entities "need not use the form prescribed by the Government, EBSA Form 700, and need not send copies to health insurance issuers or third-party administrators" in order to obtain the accommodation.  As the Court noted, the contraceptive mandate would not be enforced against an objecting entity so long as that entity "informs the Secretary of Health and Human Services in writing that it is a nonprofit organization that holds itself out as religious and has religious objections to providing coverage for contraceptive services."  *Id.*  Federal regulations have since specified that, if an entity opts to take this approach in lieu of self-certification, the notice must include:

---

[3]Since we published our initial opinion, the only change to these eligibility requirements has been to expand them to include "closely held for-profit entit[ies]," in light of *Hobby Lobby.  See* 29 C.F.R. § 2590.715-2713A(a)(2)(ii); 29 C.F.R. § 2590.715-2713A(a)(4).

a.    "the name of the eligible organization and the basis on which it qualifies for an accommodation,"

b.    "its objection based on sincerely held religious beliefs to coverage of some or all contraceptive services,"

c.    "the [insurance] plan name and type," and

d.    "the name and contact information for any of the plan's third party administrators and health insurance issuers."

29 C.F.R. § 2590.715-2713A(b)(1)(ii)(B) (self-insured plans); 29 C.F.R. § 2590.715-2713A(c)(1)(ii) (fully-insured plans). As evidenced below, these approaches are remarkably similar to one another.

|  | *Self-Certification* | *Notice* |
| --- | --- | --- |
| **Must be . . .** | An eligible organization with a sincerely held religious objection to providing contraceptive coverage | An eligible organization with a sincerely held religious objection to providing contraceptive coverage |
| **Must provide . . .** | Name of organization<br><br>Name and title of individual authorized to make certification<br><br>Contact information of individual authorized to make certification | Name of organization<br><br>Name and type of insurance plan<br><br>Contact information of TPA or health insurance issuer |
| **Must be delivered to . . .** | TPA or health insurance issuer | Secretary of HHS |

That is not a coincidence. Consider the actors at play: the non-profit, the insurance issuer (or, for self-insured plans, the TPA), and the government. When a non-profit chooses to exercise the accommodation via self-certification, it essentially says to its insurer, "I don't support providing contraception coverage and I'm not going to pay for it. You and the government need to figure out what to do from here." On the other hand, when a non-profit chooses to exercise the accommodation via notice, it essentially says to the government, "I don't support providing contraception coverage and I'm not going to pay for it. You and my insurer need to figure out what to do from here." These procedures are functionally equivalent.

**B. Procedural History**

This case is a consolidated appeal of two cases, one arising out of the U.S. District Court for the Western District of Michigan and the other from the U.S. District Court for the Middle District of Tennessee. Both district courts denied Plaintiffs' request for preliminary injunctive relief. *Mich. Catholic Conference*, 755 F.3d at 381–82. We affirmed. *Id.* at 398. Plaintiffs then filed a petition for a writ of certiorari. Pet. for Writ of Cert., *Mich. Catholic Conference v. Burwell* (No. 14-701), 2014 WL 7166539. The Supreme Court granted this petition, vacated our judgment, and remanded the case back to us for further consideration in light of *Hobby Lobby*. We requested and received supplemental briefing from the parties.

## II. ANALYSIS

**A. Standard of Review**

"We review the district court's denial of preliminary . . . injunctive relief for abuse of discretion." *Jolivette v. Husted*, 694 F.3d 760, 765 (6th Cir. 2012). "In considering whether preliminary injunctive relief should be granted, a court considers four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Id.* (internal quotation marks omitted). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Id.* (internal quotation marks omitted).

**B. Likelihood of Success on the Merits**

We begin our analysis by reviewing *Hobby Lobby*, as the Supreme Court instructed us to do. We then examine what effect (if any) *Hobby Lobby* had on our initial opinion, and explain why we adhere to our original disposition. Finally, we survey case law from our sister circuits to show that our conclusions are well supported by the reasoning of our judicial colleagues.

### 1. *Hobby Lobby*

The central issue in *Hobby Lobby* was whether the federal government may, under RFRA, "demand that three closely held corporations provide health-insurance coverage for methods of contraception that violate the sincerely held religious beliefs of the companies' owners." *Hobby Lobby*, 134 S. Ct. at 2759. The Court answered this question in the negative. This conclusion was the product of a multi-step analysis. First, the Court determined that HHS's contraceptive mandate "impose[d] a substantial burden" on the corporations' exercise of their religious beliefs. 134 S. Ct. at 2775–79. Next, it assumed without deciding that the mandate served a compelling government interest. *Id.* at 2780. Notwithstanding this assumption, however, it held that the regulations were nonetheless not "the least restrictive means of furthering th[is] compelling governmental interest." *Id.*

*Hobby Lobby* tells us, in sum, that the government cannot compel closely held companies with sincere religious objections to provide contraception coverage to their employees. But that issue is fundamentally different from the issue at the heart of this case—whether an entity's decision not to provide such coverage by exercising an accommodation is, by itself, a violation of that entity's religious beliefs.[4] We upheld this accommodation against a RFRA challenge in our initial opinion. Nothing in *Hobby Lobby* changes this analysis.

In fact, the Court made abundantly clear in its opinion that it was *not* going to rule on the legality of the accommodation. *Id.* at 2782 ("We do not decide today whether an approach of this type complies with RFRA for purposes of all religious claims."). There are, however, at least *some* indications from the Court that this arrangement would pass muster. First, the Court discussed the accommodation favorably when compared alongside the more onerous practices that were being contested by petitioners in *Hobby Lobby*. *See id.* ("At a minimum . . . [the accommodation] does not impinge on the plaintiffs' religious belief that providing insurance coverage for the contraceptives at issue here violates their religion, and it serves HHS's stated interests equally well."). Second, the Court, in responding to the charge that it was adopting an

---

[4]Plaintiffs raised a number of other claims in their initial briefs before us, alleging, for instance, that the exemption and accommodation also ran afoul of the APA and the First Amendment. Plaintiffs, however, did not renew these challenges in their petition for a writ of certiorari, focusing entirely on the legality of the accommodation vis-à-vis RFRA. This opinion addresses this central issue. We re-issue and re-affirm our prior opinion on all other issues.

all-too-expansive reading of RFRA, described its holding in *Hobby Lobby* as being "very specific." *Id.* at 2760.

To be fair, neither of these passages provides us with a definitive signal one way or another. But that should not come as a surprise. As we and other courts have made clear, *Hobby Lobby* attempted to address a question different from the question that we must now take up. *See, e.g., Little Sisters of the Poor*, 2015 WL 4232096, at *4 ("In other words, unlike in *Hobby Lobby,* the Plaintiffs do not challenge the general obligation under the ACA to provide contraceptive coverage. They instead challenge the process they must follow to get out of complying with that obligation."). Under *Hobby Lobby*, closely held companies with sincere religious objections cannot be compelled to comply with the contraceptive mandate; indeed, like certain non-profit organizations, they are now eligible for an accommodation. But the availability of an accommodation that allows an organization to refrain from paying for contraception does not negate the underlying federal requirement that *some* entity must provide contraceptive coverage.

### 2. Plaintiffs' RFRA Challenge to the Accommodation

#### a. Question of Law

We made this point clear in our original opinion, stating at the outset that we were presented with a question of "how the regulatory measure *actually works*"—i.e., what the law actually requires of the various actors (the non-profit entity, the insurer or the TPA, and the federal government). *Mich. Catholic Conference*, 755 F.3d at 385. That, we held, was a question of law, separate and apart from "the moral or theological consequences of appellants requesting the exemption or accommodation." *Id.* Whether a law imposes a substantial burden on a party is something that a court must decide, not something that a party may simply allege.

Every other circuit court to have addressed this issue has come to the same conclusion. In *Geneva College v. Secretary of the U.S. Department of Health and Human Services*, 778 F.3d 422, 435 (3d Cir. 2015), for example, the Third Circuit rejected Plaintiffs' argument "that the accommodation requires them to be 'complicit' in sin." The court noted that, regardless of "the reasonableness of the appellees' religious beliefs," the court's legal analysis would instead focus

on "how the regulatory measure actually works"—echoing our language. *Id.* at 436. *See also Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 247 (D.C. Cir. 2014) ("Accepting the sincerity of Plaintiffs' beliefs, however, does not relieve this Court of its responsibility to evaluate the substantiality of any burden on Plaintiffs' religious exercise, and to distinguish Plaintiffs' duties from obligations imposed, not on them, but on insurers and TPAs. Whether a law substantially burdens religious exercise under RFRA is a question of law for courts to decide, not a question of fact."); *E. Tex. Baptist Univ.*, 2015 WL 3852811, at *5 ("[W]e are bound to follow [the Supreme Court's decisions in] *Roy* and *Northwest Indian Cemetery* by deciding, as a question of law, whether the challenged law pressures the objector to modify his religious exercise."); *Univ. of Notre Dame v. Burwell*, 786 F.3d 606, 614 (7th Cir. 2015) ("The delivery of a copy of the form to [the insurance issuer] reminds it of an obligation that the *law*, not the university, imposes on it—the obligation to pick up the ball if Notre Dame decides, as is its right, to drop it.").

On this point, we are particularly mindful of the Tenth Circuit's analysis in *Little Sisters of the Poor*. In that case, the court noted that "whether a law substantially burdens religious exercise in one or more of these ways is a matter for courts—not plaintiffs—to decide." 2015 WL 4232096, at *18. The court acknowledged that "substantiality does not permit us to scrutinize the theological merit of a plaintiff's religious beliefs—instead, we analyze the intensity of the coercion applied by the government to act contrary to those beliefs." *Id.* at *19 (internal quotation marks omitted). "Our only task is to determine whether the claimant's belief is sincere, and if so, *whether the government has applied substantial pressure* on the claimant to violate that belief." *Id.* (quoting *Hobby Lobby v. Sebelius*, 723 F.3d 1114, 1137 (10th Cir. 2013)) (emphasis added). "In determining whether a law or policy applies substantial pressure on a claimant to violate his or her beliefs, we consider how the law or policy being challenged actually operates and affects religious exercise." *Id.* The Tenth Circuit cited legislative history in support of this point, noting that "Congress added the word 'substantially' before passage to clarify that only some burdens would violate the act." *Id.* at *18. The court also pointed out that, "[i]f plaintiffs could assert and establish that a burden is 'substantial' without any possibility of judicial scrutiny, the word 'substantial' would become wholly devoid of independent meaning." *Id.*

We are in accord with this reasoning. If the substantiality of a burden were to turn on the "moral or theological consequences" of Plaintiffs' religious beliefs, then the substantial-burden analysis would not be much of an analysis at all. Indeed, every party alleging a RFRA violation could state that their religious beliefs were being burdened and that the burden was substantial. This was not Congress's intent when it drafted RFRA, nor have we found any case law to support this interpretation.

### b. The Exemption

After determining in our initial opinion that we were confronted with a question of law, we then noted that all Plaintiffs were either "eligible for the religious-employer exemption" or "for the accommodation." *Mich. Catholic Conference*, 755 F.3d at 385.

We held that those entities eligible for the religious-employer exemption—MCC, CDN, and St. Cecilia Congregation—had "not demonstrated a strong likelihood of success on the merits" because they had failed to "identify any particular action that they must take to obtain the exemption." *Id.* Their mere status as religious employers meant that they did not need to comply with "the requirement to provide contraceptive coverage." *Id.* (internal quotation marks omitted). Plaintiffs did not challenge this determination in their petition for a writ of certiorari. *See* Pet. for Writ of Cert., 2014 WL 7166539, at *3 ("This case is also not about a challenge to an exemption."). We see no need to revisit our analysis. For entities entitled to the exemption, the ACA does not change a thing. Religious employers did not need to provide, pay for, or facilitate access to contraceptives prior to the ACA, and they do not need to do so now.

### c. The Accommodation

We also, in our initial opinion, rejected Plaintiffs' argument "that the . . . accommodation arrangement forces them to provide, pay for, and/or facilitate access to contraceptive coverage." *Mich. Catholic Conference*, 755 F.3d at 384. We adhere to this disposition today, and elaborate upon our reasoning by examining fully-insured and self-insured plans separately.

**(1) Fully-Insured Plans**

Five of the remaining six Plaintiffs—Catholic Charities of Tennessee, Camp Marymount, MQA, St. Mary Villa, and Aquinas College—offer fully-insured plans. Under these plans, the insurance company bears the risk of providing coverage and paying for individual claims. In exchange, the non-profit entity pays a premium for each employee. "[P]remiums vary . . . based on employer size, employee population characteristics, and health care use." Fast Facts from EBRI. Smaller employers are more likely to be fully-insured because such plans insulate them from having to bear the cost of coverage should their employees have to file a number of significant claims. Insurance companies can offer these types of plans so long as they work with multiple entities, thereby evening out the risk associated with any particular entity. Here, for instance, Plaintiffs MQA and St. Mary Villa "collaborate with one another and pool their resources in order to provide a health benefits plan to their employees." R. 1 (Compl. at ¶ 79) (Page ID #20) (M.D. Tenn.). This health plan "is a fully-insured plan, offered and administered by Blue Cross Blue Shield of Tennessee." *Id.* at ¶ 80 (Page ID #20).

Under federal law, insurance companies that provide fully-insured plans *must* provide contraceptive coverage—this is an obligation independent and irrespective of the wishes of the non-profit entity that it works with. *Mich. Catholic Conference*, 755 F.3d at 387–88. This legal requirement applies whether or not the non-profit entity objects. The only difference between objecting and non-objecting entities is the cost of the premium that the entity must pay. If the entity does not object, the premium will include the cost of contraceptive coverage. If the entity does object, the premium will not include the cost of coverage. Importantly, for the insured, the effect is the same: under either scenario, the insured will receive coverage.

The process for making one's objections known is straightforward, and not substantially burdensome. Consider, for instance, what a plaintiff would need to do in order to self-certify. The plaintiff would complete EBSA Form 700 and deliver this form to its insurer. That form requires the entity to state its name, the name of the individual who has made the authorization on behalf of the entity, and that individual's contact information. This is not a substantial

burden.  It is, in fact, difficult to think of a more *de minimis* request:  tell us who you are, and tell us how we can contact you.[5]

Our reasoning tracks the Tenth Circuit in this respect.  In *Little Sisters of the Poor*, that court noted that "[b]y delivering the Form or notifying HHS, an organization with an insured plan does not enable coverage—to the contrary, it simply notifies its health insurance issuer that the organization will not be providing coverage."  2015 WL 4232096, at *22.  "The health insurance issuer then has an independent and exclusive obligation to provide that coverage without cost sharing."  *Id.*  "Because the ACA obligates health insurance issuers to provide contraceptive coverage, they must meet this obligation independently and irrespective of the notification.  The self-certification does not impose any responsibility; it merely makes it the issuer's *sole* responsibility rather than one shared with the group health plan itself."  *Id.*

Plaintiffs' arguments to the contrary are without merit.  First, Plaintiffs contend that "[m]ost obviously, if Plaintiffs stopped offering health plans, their insurers . . . would have no obligation whatsoever to provide Plaintiffs' beneficiaries with the objectionable coverage."  Pls.' Supp. Br. at 11.  This argument is not persuasive.  It is true that if Plaintiffs decided not to offer health coverage at all, then they would not have to offer coverage for contraceptives.  But they would also be breaking the law.[6]  RFRA does not give parties license to break the law.  *See Little Sisters of the Poor*, 2015 WL 4232096, at *26.

Plaintiffs' remaining contentions are equally unavailing.  They argue that, "in the context of an insured plan, a religious organization's insurance issuer has no enforceable obligation to provide the mandated coverage unless the organization submits the self-certification or notification form.  Without the form, the regulations purport to require the religious organization *itself* to pay for the objectionable coverage, an arrangement precluded by *Hobby Lobby*."  Pls.' Supp. Br. at 12–13 (citation omitted).  This is a clever (but incorrect) sleight of hand.

---

[5]Other circuits have compared the accommodation provision to the conscientious-objector process.  *See Priests for Life*, 772 F.3d at 246.  This analogy is apt.

[6]"The ACA requires that employers with 50 or more full-time employees provide health insurance for their full-time employees or pay a penalty on their federal tax return."  *Mich. Catholic Conference v. Sebelius*, 989 F. Supp. 2d 577, 582 (W.D. Mich. 2013).

As other courts have made clear, "[w]ith insured plans, the health insurance issuer bears legal responsibility to provide contraceptive coverage *whether or not the religious non-profit has opted out*." *Little Sisters of the Poor*, 2015 WL 4232096, at *24 (emphasis added). In other words, Plaintiffs are fundamentally wrong in their understanding of how the law actually works. Contrary to Plaintiffs' characterization, the religious organization's insurance issuer *does* have an enforceable obligation to provide coverage *regardless* of whether the organization submits a self-certification or notification form. To be sure, *if* an organization decides not to self-certify or decides not to notify HHS, then the organization will have to pay for contraceptive coverage. But that is the entire purpose of having an opt-out process: so that objecting entities can identify themselves and so that other actors can proceed accordingly.

### (2) Self-Insured Plans

We turn finally to the one Plaintiff in this case offering a self-insured plan: Catholic Charities of Kalamazoo. In our original opinion, we explained why its assertion that it was being compelled to provide, pay for, and/or facilitate contraceptive coverage was unavailing.

First, we held that Catholic Charities of Kalamazoo was "not required to 'provide' contraceptive coverage." *Mich. Catholic Conference*, 755 F.3d at 386. After an organization makes its objections clear, "the eligible organization's health plan does not host the coverage." *Id.* "Instead, the [organization's] third-party administrator 'shall be responsible for . . . compliance with' the preventive care and screenings provided for in the HRSA guidelines." *Id.* (quoting 29 C.F.R. §§ 2510.3-16(b), (b)(1)). "Thus, although the . . . third-party administrator will provide contraceptive coverage, [Catholic Charities of Kalamazoo] will not." *Id.* Nor, we noted, was Catholic Charities of Kalamazoo "required to 'pay for' contraceptive coverage." *Id.* The TPA must instead pick up the tab. Regulations allow these companies to seek up to 110% reimbursement from the federal government. *See Univ. of Notre Dame*, 786 F.3d at 609. The accommodation, in other words, essentially shifts the cost of contraceptive coverage from the objecting entity to the federal government. Finally, we stated that Catholic Charities of Kalamazoo was "not required to 'facilitate access to' contraceptive coverage." *Mich. Catholic Conference*, 755 F.3d at 387. "The obligation to cover contraception will not," we noted, "be triggered by the act of self-certification—it already was triggered by the enactment of the ACA."

*Id.*; *see also id.* at 389 ("Self-certification allows the eligible organization to tell the insurance issuer and third-party administrator 'we're excused from the new federal obligation relating to contraception,' and in turn, the government tells those insurance companies, 'but you're not.'" (quoting *Univ. of Notre Dame v. Sebelius*, 743 F.3d 547, 557 (7th Cir. 2014))).

This analysis remains valid. As other courts have acknowledged, the contraceptive mandate works differently with respect to a self-insured plan. *See E. Tex. Baptist Univ.*, 2015 WL 3852811, at *2; *Little Sisters of the Poor*, 2015 WL 4232096, at *24 ("With self-insured plans, the TPA shoulders legal responsibility for coverage only after the religious non-profit has opted out."). Unlike the insurance issuer in a fully-insured plan, a TPA does not *necessarily* have an independent obligation to provide contraceptive coverage because, as a TPA, it does not *necessarily* have an independent obligation to provide any coverage. For non-objecting entities, all a TPA is supposed to do is assist the entity by, for example, developing provider networks or negotiating discounted rates for services. The TPA is supposed to serve strictly as an administrator; the risk and cost of providing coverage are borne by the entity. With respect to the contraceptive mandate, the TPA steps in only when the entity—here, Catholic Charities of Kalamazoo—makes its objections known.[7] According to Plaintiffs, this conditional language means that an action that a Plaintiff takes "triggers the TPA's obligation to 'provide or arrange payments for contraceptive services.'" Pls.' Supp. Br. at 12 (quoting 26 C.F.R. § 54.9815-2713AT(b)(2)).

This assertion is incorrect. As the Tenth Circuit explained in *Little Sisters of the Poor*, "[b]y opting out, the self-insured plaintiffs shift their duty to provide coverage to a TPA, but they do not change their plan participants and beneficiaries' entitlement to contraceptive coverage under federal law." 2015 WL 4232096, at *25. To be sure, "opting out is necessarily a but-for cause of someone else—the TPA—providing contraceptive coverage." *Id.* But "that is the point of an accommodation—shifting a responsibility from an objector to a non-objector. That is how a legislative policy choice—here, to afford women contraceptive coverage—can be reconciled with religious objections to that policy." *Id.* To put it another way, RFRA allows certain parties

---

[7]We noted in our original opinion that "[n]othing in the record indicates that Catholic Charities of Kalamazoo's third-party administrator has refused to provide contraceptive coverage upon receipt of a self-certification form." 755 F.3d at 386 n.11. Plaintiffs have not challenged this determination.

to request that the government create an exception to the rule *for that particular party*. It does not, however, allow accommodated parties to challenge the rule itself. *See Mich. Catholic Conference*, 755 F.3d at 388 ("'Never to our knowledge has the Court interpreted the First Amendment to require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family.'" (quoting *Bowen v. Roy*, 476 U.S. 693, 699 (1986))). Indeed, Plaintiffs have all but conceded this point. *See* Pet. for Writ of Cert., 2014 WL 7166539, at *3 ("Although Petitioners . . . oppose the Government's goal of providing such coverage, they do not challenge the legality of that goal.").

Despite our attempts to describe how the accommodation actually works, it is perhaps inevitable that some Plaintiffs will still believe that they are morally complicit in sin, by being a part of a system that provides access to contraceptives. *See, e.g.*, *id.* ("Petitioners ask only that they not be forced to violate their religious beliefs by participating in the regulatory scheme by which the Government seeks to accomplish its ends."). However, it is not our role to determine a party's moral complicity; we do not question here Plaintiffs' "desire not to participate in the provision of contraception." *Mich. Catholic Conference*, 755 F.3d at 384. Our role is a more limited one: to determine whether, *as a legal matter*, the regulation represents a substantial burden to Plaintiffs' rights under RFRA. That requires us to determine how the law works and what it asks of various actors. On this point, as we held before, "[t]he government's imposition of an independent obligation on a third party does not impose a substantial burden on the appellants' exercise of religion." *Id.* at 388.

### 3. Supporting Case Law

Our sister circuits have also arrived at this conclusion. Similar legal challenges have been brought in a number of other federal courts. As of this writing, six other circuits have addressed whether the accommodation passes muster under RFRA. All six have upheld the accommodation, and all six have held that *Hobby Lobby* does not suggest anything to the contrary.

In *Geneva College*, the Third Circuit was confronted with a set of three plaintiffs—two that offered self-insured health plans and one that offered a fully-insured health plan. In the course of upholding the accommodation against all three plaintiffs, the court discussed and

dismissed the plaintiffs' reliance on *Hobby Lobby*. 778 F.3d at 436–37; *see also id.* at 441 ("[C]ase law clearly draws a distinction between what the law may impose on a person over religious objections, and what it permits or requires a third party to do. Although that person may have a religious objection to what the government, or another third party, does with something that the law requires to be provided (whether it be a Social Security number, DNA, or a form that states that the person religiously objects to providing contraceptive coverage), RFRA does not necessarily permit that person to impose a restraint on another's action based on the claim that the action is religiously abhorrent.").

The D.C. Circuit likewise rejected plaintiffs' RFRA challenge to the accommodation in *Priests for Life*. The court subsequently denied the plaintiffs' petition for rehearing en banc. The court's decision to deny rehearing was accompanied by a six-page concurral from Judge Pillard, which she wrote "only to underscore why our court's [prior] approach accords with the Supreme Court's decision in *Burwell v. Hobby Lobby Stores, Inc.*" *Priests for Life*, No. 13-5368, slip op. at 1 (D.C. Cir. May 20, 2015) (Pillard, J., concurral). Judge Pillard noted that the provisions at issue in *Priests for Life* were legally "distinct" from those that were challenged in *Hobby Lobby*. *Id.* In *Hobby Lobby*, the petitioners were "accorded . . . a victory in a contest over what *religious meaning* to ascribe to [their] payment for contraceptive coverage." *Id.* at *5. "That holding," however, "does not require us to credit Priests for Life's legally inaccurate assertions about the *operation of the regulation* they challenge." *Id.* "[T]he whole point of the challenged regulation is to scrupulously shield objecting religious nonprofits from any role in making contraception available to women"—in other words, to prevent organizations from having to provide, pay for, or facilitate access to contraceptives. *Id.* at *6; *see also Catholic Health Care Sys. v. Burwell*, ____ F.3d ____, ____, 2015 WL 4665049, at *10 (2d Cir. Aug. 7, 2015) (relying on *Priests for Life*, 722 F.3d at 253, and stating that "[v]iewed objectively, completing a form stating that one has a religious objection is not a substantial burden.").

Next, the Fifth Circuit rejected an accommodation challenge in *East Texas Baptist University*. The court acknowledged that "the plaintiffs have identified several acts that offend their religious beliefs." 2015 WL 3852811, at *5. But "the acts *they* [the plaintiffs] are required to perform do not include providing or facilitating access to contraceptives." *Id.* "Instead, the

acts that violate their faith are those of third parties." *Id.* RFRA, however, "confers no right to challenge the independent conduct of third parties." *Id.* The court went on to address and reject the plaintiffs' remaining arguments in short order, noting that federal law, not the accommodation, triggers contraceptive coverage, *id.*; that the regulations do not require plaintiffs to pay for contraceptive coverage (in fact, they do the exact opposite), *id.* at \*6; and that the accommodation does "not make it easier for [insurers] to pay for contraceptives, and do[es] not imply endorsement of contraceptives," *id.* at \*7.

Finally, decisions from the Seventh Circuit and the Tenth Circuit are particularly informative, given the procedural similarity between our case and the Seventh Circuit's *Notre Dame* case and the thoroughness of the Tenth Circuit's decision.

As in our case, the Seventh Circuit initially rejected appellants' challenge to the accommodation, in a decision published before *Hobby Lobby*. *See Univ. of Notre Dame*, 743 F.3d at 559. Notre Dame subsequently filed a petition for a writ of certiorari. The Supreme Court granted Notre Dame's petition, vacated the Seventh Circuit's judgment, and remanded the case "for further consideration in light of *Burwell v. Hobby Lobby Stores, Inc.*" 135 S. Ct. 1528 (2015). On remand, the Seventh Circuit once again denied Notre Dame's request for injunctive relief. 786 F.3d at 619. The court rejected Notre Dame's allegation that it served as a "conduit between the suppliers of [contraceptive] coverage and the university's students and employees." *Id.* at 612. As the Seventh Circuit explained, "the only 'conduit' is between the [insurance] companies and Notre Dame students and staff; the university has stepped aside." *Id.*; *see also id.* at 614 ("[I]n invoking the [accommodation] the university . . . throws the entire administrative and financial burden of providing contraception on the health insurer and third-party administrator, which are secular organizations that unlike the university have no aversion to providing contraceptive coverage. The result is to lift a burden from the university's shoulders."). The court also considered various alternative measures proposed by Notre Dame. It rejected all of them. It noted that one alternative was "not contraception at all," that another alternative "elide[d] all consideration of the costs and complications of the administrative machinery for providing tax incentives to consumers," and that the remaining alternatives

"involve[d] cumbersome administrative machinery and . . . impose[d] a burden on Notre Dame's female students and employees who want to obtain contraceptives." *Id.* at 617.

The Seventh Circuit's recent decision in *Wheaton College v. Burwell*, __ F.3d ____, 2015 WL 3988356 (7th Cir. July 1, 2015), is likewise informative. This decision came in the aftermath of the Supreme Court's order, discussed above, where the Court held that Wheaton College need not complete EBSA Form 700, but could instead inform the Secretary of HHS of its objections to the contraceptive mandate. Despite this order, "[t]he college argue[d] that it remain[ed] involuntarily complicit in the provision of emergency contraception because its notification to the Department that it objects to the provision of contraception on religious grounds serves as the 'trigger' of the Department's ordering the insurers to cover emergency contraception." *Id.* at *4. The Seventh Circuit rejected this characterization, carefully explaining why the college's position was incorrect. "To exercise this right of refusal the college has only to notify its health insurers, or if it prefers the Department of Health and Human Services, of its unwillingness to provide coverage. The insurers are then obligated by the Affordable Care Act to provide the coverage directly . . . . The college and its health plans are thus bypassed." *Id.* at *3. "So when Wheaton College tells us that it is being 'forced' to allow 'use' of its health plans to cover emergency contraceptives, it is wrong. It's being 'forced' only to notify its insurers (including third-party administrators), whether directly or by notifying the government (which will forward the notification to the insurers), that it will *not* use its health plans to cover emergency contraception." *Id.*

Finally, and most recently, the Tenth Circuit denied an accommodation challenge in *Little Sisters of the Poor*. We have referred to its reasoning throughout our opinion, and now take note of only a few of the court's pertinent observations. First, the court highlighted the unusual nature of the plaintiffs' claims. As it noted, "[m]ost religious liberty claimants allege that a generally applicable law or policy *without a religious exception* burdens religious exercise, and they ask courts to strike down the law or policy or excuse them from compliance." 2015 WL 4232096, at *14 (emphasis added). Yet, in this case, "the Departments have developed a religious accommodation rather than leaving it for the courts to fashion judicial relief." *Id.* Thus, "[p]laintiffs not only challenge a law that requires them to provide contraceptive coverage

against their religious beliefs, they challenge the exception that the law affords to them." *Id.* None of the legal precedents cited by the plaintiffs "involve a situation where the government offer[ed] religious objectors an accommodation." *Id.* The court then took note of its prior decision in *United States v. Friday*, 525 F.3d 938 (10th Cir. 2008), where it had stated that, "[l]aw accommodates religion; it cannot wholly exempt religion from the reach of the law." *Id.* at *15 (quoting *Friday*, 525 F.3d at 960). This discussion underscores the atypical nature of Plaintiffs' claim in this case. No court has invalidated an accommodation that is as simple to comply with as the one at issue in this case. We see no reason to do so now.

The Tenth Circuit's discussion of the opt-out process also strongly supports our analysis. The court stated that the "[p]laintiffs are not substantially burdened solely by the *de minimis* administrative tasks this involves." *Id.* at *30. "All opt-out schemes require some affirmative act to free objectors from the obligations they would otherwise face." *Id.* "Having to file paperwork or otherwise register a religious objection, even if one disagrees with the ultimate aim of the law at issue, does not alone substantially burden religious exercise." *Id.* The *point* of the accommodation is to insulate objecting entities from providing, paying for, or facilitating access to contraception. The *process* for obtaining the accommodation is not burdensome, as it requires no more effort than would be required for any routine administrative task.

These cases highlight the multitude of reasons why Plaintiffs' arguments in this case fail: because there is an underlying federal obligation to provide contraceptive coverage, because the opt-out is hardly a burden at all (much less a substantial burden), because the whole point of a federal religious accommodation is to *accommodate* the beliefs of the religious organization with the valid legislative policy goals set forth by Congress. The consistent reasoning of our sister circuits supports this conclusion.

## C. Remaining Factors for Injunctive Relief

The remaining factors that we must consider in evaluating a request for preliminary injunctive relief are: "(2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Jolivette*, 694 F.3d at 765 (internal quotation marks omitted). "[A] finding that there is simply no

likelihood of success on the merits is usually fatal." *Id.* (internal quotation marks omitted). There is nothing in the three remaining factors that outweighs the clear unlikelihood of success in this case. The district courts did not abuse their discretion by denying Plaintiffs preliminary injunctive relief.

### III.  CONCLUSION

The accommodation at issue here does not violate RFRA. We **RE-ISSUE** and **RE-AFFIRM** our prior opinion, *Michigan Catholic Conference & Catholic Family Services v. Burwell*, 755 F.3d 372 (6th Cir. 2014), with respect to all other issues raised by Plaintiffs. Accordingly, we **AFFIRM** the district courts' judgments denying preliminary injunctive relief to Plaintiffs on all of their claims.